PEDRO JUAN SOTO y OTROS, demandantes y apelantes, *v.* MIGUEL GIMÉNEZ MUÑOZ, SECRETARIO DE JUSTICIA y OTROS, demandados y apelados.

*Número:* O-79-215 *Resuelto:* 31 de marzo de 1982

478

*Héctor A. Colón Cruz; Procurador General,* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de los demandados apelados; *Pedro J. Varela* y *Antonio Fernós López-Cepero,* abogados de los demandantes apelantes.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La excesiva y amplia ambigüedad del estatuto en que el Estado apoya su posición, y la ausencia de guías y parámetros razonables, nos impide que apliquemos la respetable norma tradicional que reclama del Poder Judi-

cial explorar otras avenidas para soslayar un decreto de inconstitucionalidad. El derecho a la libre expresión y a la libertad de información serían innecesariamente inmolados si adoptamos ese curso de acción.

Hecha esa aclaración, evaluemos el dictamen del Tribunal Superior, Sala de San Juan, que sostiene la constitucionalidad de la clasificación de *confidencialidad* de la investigación realizada por el Negociado de Investigaciones Especiales del Departamento de Justicia sobre los sucesos ocurridos el 25 de julio de 1978 en el Cerro Maravilla, bosque estatal Toro Negro, jurisdicciones Jayuya y Ponce, al amparo del Art. 13 de la Ley Núm. 38 de 13 de julio de 1978 (3 L.P.R.A. sec. 138(1)). La tarea requiere una sucinta exposición del trasfondo básico de tales hechos según éstos fueron parcialmente depurados por el Poder Judicial.[1]

## I

### TRASFONDO FÁCTICO Y PROCESAL

En la madrugada del 25 de julio de 1978, Alejandro González Malavé, agente encubierto de la Policía de Puerto Rico con siete (7) años de experiencia, notificó a sus superiores —oficiales Cruz y Quiles— que miembros del Movimiento Revolucionario Armado —en el cual se había infiltrado— se proponían asaltar cualquier vehículo, tomar como rehén a su conductor y, mediante amenazas, obligarlo a llevarlos hasta el área donde están instaladas las torres de comunicación en el referido Cerro Maravilla. Dicho agente no sugirió arrestar a esas personas, a quienes el día anterior había visto portar armas en contravención del Art. 8 de la Ley de Armas, ni tenía instrucciones de sus superiores para proceder a su arresto.

---

[1] Sentencia dictada por el Tribunal Superior, Sala de Utuado el 26 de enero de 1981 en el caso civil CS-78-1262, *Julio Ortiz Molina y Catalina Martínez* v. *Estado Libre Asociado de P.R.*, *Alejandro González Malavé*. Contra dicho dictamen los allí demandantes instaron revisión ante este foro y denegamos su expedición. El Estado no cuestionó esa sentencia. (R-81-72)

Así las cosas, en esa misma fecha, alrededor del mediodía mientras el porteador público Julio Ortiz Molina conducía su vehículo de motor por la carretera que conduce de Ponce a Juana Díaz, cerca del Hospital de Distrito de Ponce, respondió a una señal de tres jóvenes y detuvo su vehículo. Éstos lo encañonaron con armas de fuego y se incautaron del vehículo por la fuerza. Dos de éstos eran los jóvenes independentistas Carlos Enrique Soto Arriví y Arnaldo Darío Rosado Torres, y el otro el agente encubierto Alejandro González Malavé, en funciones oficiales de su cargo. González Malavé ocupó y tomó el volante del vehículo y, mientras los otros dos mantenían encañonado a Ortiz, se dirigió hasta las torres de comunicación del Cerro Maravilla. Allí estacionaron el vehículo junto a una verja de alambre eslabonado y ordenaron a Ortiz que no lo abandonase. Acto seguido, portando sus armas de fuego se dirigieron a la parte posterior del vehículo. Mientras Ortiz "miraba hacia el frente, observó que varias personas, vestidas en forma similar, salían de la maleza que había en el lugar, llevando armas largas en sus manos. Las personas caminaron hacia el lugar donde se encontraban los tres jóvenes, quienes aparentemente no se habían percatado de la presencia de tales personas. Al advertir que las personas que salían de la maleza, calificados luego como 'agentes', levantaban sus armas como para disparar, el demandante [Ortiz] se escondió hundiéndose en la parte delantera del vehículo".

En ese momento comenzó un tiroteo detrás del vehículo, sin que Ortiz pueda precisar con exactitud quien inició el mismo. El vehículo recibió ocho impactos de balas.

González Malavé portaba ese día una pistola que oportunamente usó, y también un revólver de reglamento que no disparó. Al terminar el tiroteo "dos personas —que el demandante llama agentes— abrieron ambas puertas delanteras de su vehículo. El que abrió la puerta derecha le manifestó al demandante [Ortiz]: 'Sal, antes de que te

acribille', a lo que éste replicó: 'Yo soy una víctima.' La otra persona abrió la puerta del lado del conductor y haló al demandante por la parte del hombro de su camisa. Uno de los 'agentes' intentó pegarle por la cabeza al demandante con la culata de un arma larga, por lo que el demandante se cubrió instintivamente con su mano izquierda, recibiendo el golpe en el dedo anular de dicha mano. Luego, le propinaron una patada y le ordenaron que se lanzara al suelo junto a dos de los jóvenes que antes habían ocupado su vehículo por la fuerza y que yacían heridos en el suelo cerca de su automóvil. El demandante observó que los jóvenes estaban heridos y sangrantes; aún así le gritaban a los 'agentes' 'que ese señor' (el demandante) era una 'víctima inocente'. A renglón seguido, 'los agentes' subieron al demandante a un vehículo y lo condujeron a otra torre que hay en el mismo sector, a unos cuatro minutos de distancia en automóvil de la primera torre. Estando allí el demandante, entraban y salían miembros y oficiales de la Policía de Puerto Rico, quienes lo interrogaban. Éstos le dejaron detenido en esta segunda torre, bajo la custodia de un policía uniformado de apellido Quiñones. Transcurridos unos 15 ó 20 minutos, el demandante escuchó una segunda ráfaga de disparos provenientes de la primera torre que provocó en el Policía Quiñones la siguiente reacción: 'Parece que allá abajo continúa la película de vaqueros' ".

Subsiguientemente durante la tarde, Ortiz fue custodiado y llevado al Cuartel de la Policía de Ponce, e interrogado por el Fiscal Hernán Nigaglioni, mientras un Teniente de la Policía de apellido Ortiz, escribía a maquinilla su declaración. El demandante Ortiz con posterioridad negó parcialmente el contenido de esa declaración, lo que motivó que posteriormente fuera apercibido por miembros del Ministerio Fiscal, de una posible acusación por perjurio. Como consecuencia de este choque armado los jóvenes Soto Arriví y Rosado Torres perdieron la vida y resultó herido el agente González Malavé.

El incidente del Cerro Maravilla fue objeto de una intensa publicidad y cobró gran resonancia en los medios noticiosos del país. Diversos sectores hicieron serias acusaciones en cuanto a la forma en que las autoridades atendieron la situación, en particular el conocimiento previo de algunos funcionarios del Poder Ejecutivo, y si tales muertes pudieron o no prevenirse.

Con el propósito de esclarecer los hechos, divulgar información y hacer recomendaciones sobre la conducta de la Policía y otras agencias se formó el *Comité Soto-Rosado Contra la Represión*, integrado por un grupo de líderes y figuras religiosas, obreras e intelectuales del país y Pedro Juan Soto y Ángeles Rivera Castillo, padre y viuda, respectivamente, de cada uno de los jóvenes muertos.

Mientras tanto, por encomienda del Secretario de Justicia, el Negociado de Investigaciones Especiales y la División de Investigaciones y Procesamiento Criminal del Departamento de Justicia, realizaron una investigación —en que se acumuló información y documentación en poder exclusivo del Secretario de Justicia— que sirvió de base al informe que diera a la luz pública *el 29 de agosto de 1978*, en que *se exonera a los policías que habían intervenido en los sucesos del Cerro Maravilla y se concluía que no se radicarían cargos criminales contra ninguna persona.*

Al mes siguiente Pedro Juan Soto, padre de Carlos E. Soto Arriví, solicitó del Negociado de Investigaciones Especiales se le permitiera examinar los documentos obrantes en sus archivos relacionados con los sucesos. Ello le fue negado a base de que dicha información era confidencial al amparo del Art. 13 de la Ley Núm. 38 antes mencionada.

Invocando la Ley de Derechos Civiles de Puerto Rico, Núm. 12 de 8 de agosto de 1974 (32 L.P.R.A. sec. 3524), Pedro Juan Soto, Ángeles Rivera Castillo y demás miembros del *Comité Soto-Rosado Contra la Represión*, solicitaron Sentencia Declaratoria, Daños y Perjuicios e *Injunc-*

*tion* contra el Secretario de Justicia, el Estado Libre Asociado de Puerto Rico y otros, y pidieron que se ordenase el examen, aduciendo que tal negativa les lesionaba "los derechos constitucionales y estatutarios de los demandantes además de ser contrario al interés público en general por no permitir que se conozca y divulgue cabalmente los hechos y circunstancias sobre este asunto de vital importancia para el país". Los demandados aceptaron entregarles copia del *Informe del Cerro Maravilla* preparado el 29 de agosto de 1978.

Oportunamente el Tribunal Superior, Sala de San Juan, dictó sentencia y ordenó al Secretario de Justicia —previo pago de los derechos correspondientes— entregara copia de los protocolos de autopsia de los jóvenes fallecidos y cualquier fotografía tomada durante el proceso de autopsia y negó el examen de otros informes, grabaciones y documentos. [2]

En apelación los demandantes señalan que el Tribunal Superior cometió error al: (1) negarle copias de los documentos y grabaciones en violación a sus derechos a la libertad de expresión; (2) resolver que no constituye daño irreparable la pérdida de tal derecho; (3) decidir acceder a la entrega de algunos documentos y otros no, sin "base racional para ello"; (4) interpretar restrictivamente el derecho ciudadano a inspeccionar y copiar documentos públicos en este caso bajo el Art. 47 de la Ley de Evidencia, 32 L.P.R.A. sec. 1781; (5) entender que era menester un decreto previo de inconstitucionalidad antes de poder emitir el *injunction* solicitado; y (6) sostener la constitucionalidad del Art. 13 de la Ley Núm. 38 de julio de 1978.

[2] Con posterioridad a la sentencia del foro de instancia fechada 16 de marzo de 1979 y pendiente la apelación de decisión por este Tribunal, con fecha 19 de enero de 1981, el Fiscal Osvaldo A. Villanueva Díaz rindió al entonces Secretario de Justicia, Hon. Miguel Giménez Muñoz, el producto de una investigación especial que se le encomendara, titulado *Informe Caso Maravilla*. Al igual que en el anterior informe, se exoneró a los policías y se recomendó "el archivo *final y definitivo* de este caso".

## II

*ÁMBITO CONSTITUCIONAL*

### A. *Importancia del Derecho*

En buena metodología evaluaremos primeramente la naturaleza del derecho envuelto.

El ideal de una verdadera democracia como desiderátum en que se inspira nuestra Constitución concibe la libertad de palabra, de prensa, de reunión pacífica y de pedir al gobierno la reparación de agravios "dentro de la más dilatada"(³) visión. Por ello la Carta de Derechos expresamente consigna que "[n]o se aprobará ley alguna que restrinja" tales libertades. Art. II, Sec. 4. Es lógico, pues, concluir que existe una estrecha correspondencia entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años.

En Puerto Rico ya habíamos intimado el alto sitial del derecho de información en *Dávila* v. *Supt. de Elecciones*, 82 D.P.R. 264, 279 (1960). Allí, al interpretar el derecho estatutario de todo ciudadano de inspeccionar y copiar cualquier documento público —según la Ley de Evidencia— expresamos que "No basta con que se reconozca meramente la importante justificación política de la libertad de información. *Los ciudadanos de una sociedad que se gobierna a sí misma deben poseer el derecho legal de examinar e investigar cómo se conducen sus asuntos, sujetos sólo a aquellas limitaciones que impone la más urgente necesidad pública. Debe elevarse ese derecho a una posición de la más alta santidad si ha de constituir un baluarte contra un liderato insensible".* (Énfasis suplido.)

---

(³) 4 Diario de Sesiones de la Convención Constituyente 2564 (1961).

El transcurso del tiempo, dos décadas después, se ha encargado de demostrar la necesidad de refrendar la dimensión constitucional del derecho de acceso e información de la prensa y el público en general. Nuestra democracia, si ha de subsistir, debe oxigenarse en esta vital área de corrientes liberales.[4] Difícilmente puede ejercerse y asegurarse que "la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas", si prevalece una interpretación restrictiva.

B. *Trayectoria Jurisprudencial Norteamericana*

Por su valor instructivo examinemos brevemente la trayectoria jurisprudencial norteamericana.

El asunto de si al amparo de la Primera Enmienda de la Constitución federal existe un derecho constitucional del público de obtener acceso a información gubernamental no ha sido resuelto directamente por el Tribunal Supremo federal. En términos generales, la glosa de autores y comentaristas tiende a sugerir que debe reconocerse tal derecho como parte del sistema de libertad de expresión que se erige sobre dicha Primera Enmienda. Emerson, *Legal Foundations of the Right to Know*, 1976 Wash. L.Q. 1,

---

[4] "Permitir que el gobierno maneje los asuntos públicos bajo el manto de la secretividad es invitar a la arbitrariedad, la mala administración, la indiferencia gubernamental, la irresponsabilidad pública y la corrupción. Una ciudadanía alerta y militante contra estos males potenciales de toda maquinaria gubernamental sólo puede realizar su función fiscalizadora si tiene a la mano la información que le permita descubrir a tiempo los focos de peligro y exigir responsabilidades. Privarle de esta información equivale a producirle una parálisis colectiva agravada por la miopía cívica de quien sólo conoce a medias o desconoce por completo las actuaciones de su gobierno.

"Un segundo principio inherente a toda concepción democrática es el de la participación. Pero para que la participación sea inteligente ha de estar fundada en un constante flujo de información al público y en la posibilidad de acceso a cuanta sea necesaria para el ejercicio responsable del derecho y el deber de cada persona de tomar parte en los asuntos que le conciernen." E. Rivera Ramos, *La Libertad de Información: Necesidad de su Reglamentación en Puerto Rico*, XLIV Rev. Jur. U.P.R., Núms. 1-2, págs. 67, 69 (1975).

14; Comment, *The Public's Right of Access to Government Information under the First Amendment,* 51 Chi.-Kent L. Rev. 164 (1974); Comment, *Access to Official Information: A Neglected Constitutional Right,* 27 Ind. L.J. 209 (1952); Cross, *The People's Right to Know,* New York, Columbia University Press, 1953.

Como proposición general los diferentes estados de la Unión tampoco han reconocido la prosapia constitucional del derecho, aun cuando definitivamente hoy día nadie niega la existencia de un derecho de carácter consuetudinario (*a common law right*) de acceso a los documentos públicos en poder del Estado. *Nixon* v. *Warner Comm., Inc.,* 435 U.S 589, 597–598 (1978). [5]

Aún así, en la jurisdicción federal es detectable una preferente inclinación hacia el reconocimiento gradual de ese derecho en las siguientes instancias: (a) consistentemente ha decretado la inconstitucionalidad de leyes que restringen el derecho del ciudadano a recibir literatura religiosa, *Martin* v. *City of Struthers,* 319 U.S. 141 (1943); (b) sobre propaganda comunista extranjera, *Lamont* v. *Postmaster General,* 381 U.S. 301 (1965); y (c) sobre material pornográfico, *Stanley* v. *Georgia,* 394 U.S. 557 (1969). En este último caso se caracterizó como principio bien arraigado que la Constitución *también* protege el

---

[5] "Es evidente que los tribunales de este país reconocen un derecho general de inspeccionar y copiar actas y documentos públicos, incluso actas y documentos judiciales. En contraste con la práctica inglesa, ver, *e.g., Browne* v. *Cumming,* 10 B. & C. 70, 109 Eng. Dep. 377 (K.B. 1829), las decisiones americanas por lo general no condicionan el ejercicio de este derecho a un interés propietario en el documento o a que éste sea necesario como prueba en un pleito. El interés necesario para apoyar la expedición de un auto que ordene el acceso se ha encontrado, por ejemplo, en el deseo del ciudadano de mantenerse enterado de lo que se hace en las agencias públicas, ver. *e.g., State ex rel. Colscott* v. *King,* 154 Ind. 621–627, 57 N.W. 535, 536–538 (1900); *State ex rel. Ferry* v. *Williams,* 41 N.J.L. 332, 336–339 (1879), y en la intención de un editor de periódico de publicar una información concerniente al funcionamiento del gobierno, ver, *e.g., State ex rel. Youmans* v. *Ownes,* 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modificado en otros campos, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). Sin embargo, ver *Burton* v. *Reynolds,* 110 Mich. 354, 68 N.W. 217 (1896)." (Escolios omitidos.)

derecho de recibir información e ideas. Véase además, *Kleindienst* v. *Mandel*, 408 U.S. 753, 762–763 (1972). (⁶)

■ Otros casos han establecido que la naturaleza del derecho que emana del sistema de libre expresión supone una relación *bilateral que amerita ser protegida de forma integral.* La Primera Enmienda protege el derecho de cualquier persona de expresar libremente sus ideas sin que el Estado pueda restringir el contenido y la forma de la expresión salvo, claro está, en aquellas situaciones de urgencia social que la propia Constitución tolera. *Mas la protección no se detiene allí, sino que se extiende a la comunicación misma y al derecho del sujeto pasivo a recibirla. Virginia Pharmacy Bd.* v. *Virginia Consumer Council,* 425 U.S. 748 (1976).

En *Procunier* v. *Martínez,* 416 U.S. 396 (1974), en que se cuestionó la censura que hacían las autoridades carcelarias sobre la correspondencia de los reclusos, no fue necesario que el Tribunal se expresara sobre el derecho de éstos bajo la Primera Enmienda, en vista de que tal censura infringía el derecho constitucional de otras personas no recluidas. En sentido similar se expresó el Tribunal en otros casos. *Vide, e.g., Red Lion Broadcasting Corp.* v. *F.C.C.,* 395 U.S. 367, 390 (1969); *Griswold* v. *Connecticut,* 381 U.S. 479, 482 (1965).

Los casos examinados reflejan la dinámica presente en la dimensión de este derecho. Se ha protegido el derecho del sujeto pasivo a recibir la comunicación, lo que presupone necesariamente la existencia de un sujeto activo disponible para ofrecer la comunicación (*willing speaker*).

---

(⁶) En este caso un grupo de académicos invocó la violación a su derecho de recibir información debido a la negativa del Departamento de Estado de permitir la entrada al país de un erudito comunista invitado por aquéllos para participar en una conferencia que estaban celebrando. El Tribunal reconoció el poder del Departamento de excluir a dicha persona basándose en principios de Derecho internacional público. Después de todo, lo que el Departamento prohibía era el acceso del individuo y no de sus ideas, las cuales habían sido ampliamente difundidas en el país a través de sus libros y publicaciones.

*Virginia Pharmacy Bd.*, supra, pág. 757. En estas circunstancias es que la jurisprudencia ha dejado una distinguible huella tendente a reconocer el *derecho de acceso* en el sujeto pasivo. Ahora bien, la accesibilidad de la información gubernamental puede plantear un asunto distinto en aquellas ocasiones en que un funcionario público no quiera, o no pueda, revelar datos oficiales por disposición interdictal de la propia ley. En tales instancias está ausente, y no podemos hablar, de la figura de un sujeto activo disponible (*willing speaker*). Se quiebra, por consiguiente, el binomio estructural que supone el llamado derecho de acceso.

La indisponibilidad expresada es superable. En el caso de autos se trata de un sujeto que representa el cuerpo social mismo: el Estado. Incurriríamos en una excesiva simplificación si tratáramos de atribuirle al Gobierno condición o estados anímicos o volitivos característicos de los ciudadanos particulares y demás entes privados. *El Estado, como depositario de las funciones que emanan de la soberanía del Pueblo, no puede negar caprichosamente y sin justificación aparente la información recopilada en su gestión pública.* De ahí que, aunque el esquema de bilateralidad en el derecho constitucional de acceso a información e ideas disponibles no pueda aplicarse estrictamente a un sujeto social —que en ocasiones puede estar renuente a iniciar la comunicación que demanda el sujeto pasivo— el esquema sirve y es utilizable si concluimos que al recibir del Pueblo soberano la función de gobernar, el Estado no quedó en libertad de decidir cuáles papeles y documentos resultantes de su gestión pública estarían fuera del escrutinio de quienes son, en esencia, la fuente misma de la soberanía. Únicamente es admisible que el Estado pueda invocar el manto de secretividad para sus propias actuaciones en casos de imperativo interés público.

Recientemente, en *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), una pluralidad de jueces estuvo

de acuerdo en que la prensa y el público en general tienen derecho a estar presentes en un juicio criminal, aun cuando tal derecho de acceso no aparece enumerado en la Constitución ni expresamente consignado en las Primera y Decimocuarta Enmiendas.

En la opinión del Juez Presidente señor Burger, a la cual se unieron los Jueces señores White y Stevens, dice que la Primera Enmienda, en conjunción con la Decimocuarta, proscribe al gobierno que limite la libertad de expresión o de prensa, o el derecho del pueblo de reunirse pacíficamente en Asamblea y solicitar del gobierno la reparación de agravios. "Estas libertades garantizadas expresamente comparten el propósito común de asegurar la libertad de comunicación en asuntos relativos al funcionamiento del gobierno." Pág. 575. Y citando a *First National Bank of Boston* v. *Belloti*, 435 U.S. 765, 783 (1978), se afirma que la Primera Enmienda va más allá de la protección de la prensa y del derecho de expresión de los individuos *y prohíbe al gobierno que limite el cúmulo de información que pueda obtener el público*. No es importante nominar el derecho de la prensa de estar presente en un juicio criminal como "derecho de acceso" o "derecho de recopilar información" pues, según afirma el Juez Presidente, ya el Tribunal ha reconocido que sin alguna protección para la búsqueda de noticias, la libertad de prensa sería emasculada. Ante el argumento del Estado de que la Primera Enmienda no reconoce expresamente el derecho de la prensa de asistir a juicios criminales, se apunta que ese hecho nunca ha impedido que se reconozcan importantes derechos no enumerados:

> A pesar de la oportuna advertencia de no leer en la Constitución derechos que no están definidos explícitamente, el Tribunal ha reconocido que ciertos derechos no expresados están implícitos en contadas garantías. Por ejemplo, los derechos de asociación y de privacidad, el derecho de ser considerado inocente y el derecho de ser juzgado mediante un estándar de prueba que supere la duda razonable en un

juicio criminal, así como el derecho de viajar no aparecen en la Constitución o en la Carta de Derechos. Sin embargo, se ha encontrado que estos derechos importantes, aunque no enunciados, comparten la protección constitucional al igual que las garantías explícitas. Así, las inquietudes manifestadas por Madison y otros han sido zanjadas; el Tribunal ha reconocido que los derechos fundamentales, aun cuando no estén garantizados expresamente, son indispensables al disfrute de los derechos definidos explícitamente. (Escolios omitidos.) Págs. 579–580.

El Juez señor Stevens en opinión concurrente recalcó que en la decisión del presente caso ". . . por primera vez, el Tribunal sostiene de manera inequívoca que interferir arbitrariamente con el acceso a información importante es una limitación a la libertad de expresión y la de prensa protegidas por la Primera Enmienda". Y añadió que esta enmienda "protege al público y la prensa de que se les limite su derecho de acceso a información sobre la administración de su gobierno . . .". Págs. 582–584.

El Juez señor Brennan, en opinión con la cual concurre el Juez señor Marshall, expresó:

El enfoque del Tribunal en los casos de derecho de acceso sencillamente refleja la naturaleza especial del reclamo del derecho de obtener información al amparo de la Primera Enmienda. De ordinario, las garantías bajo la Primera Enmienda se interponen para proteger la comunicación entre el que habla y el que escucha. Cuando se emplean de este modo contra prohibiciones previas, las protecciones de la libertad de expresión son casi invencibles. . . . Pero la Primera Enmienda, más que un compromiso con la libertad de expresión y el intercambio comunicativo por sus propios méritos, desempeña un papel estructural de asegurar y fomentar nuestro sistema republicano de gobierno propio. . . . implícito en este papel estructural no sólo se encuentra "el principio de que el debate sobre asuntos públicos debe ser franco, robusto y amplio", sino también la hipótesis antecedente de que el debate público valioso —así como otras actividades cívicas— debe ser informado.

El modelo estructural vincula la Primera Enmienda con ese proceso de comunicación necesaria para que una democracia sobreviva, y de este modo trae consigo el afán no sólo de la comunicación en sí, sino también el de las condiciones indispensables para la comunicación significativa.

Sin embargo, debido a que "el alcance de esta protección es teóricamente interminable", . . . debe de invocarse con discernimiento y moderación. Porque en lo que respecta a la necesidad de información del ciudadano participante, "[h]ay pocas restricciones en acción que no podrían ser disfrazadas por un argumento ingenioso con el antifaz de un caudal reducido de datos". . . . Es necesario que se ensaye debidamente, una afirmación de la prerrogativa de obtener la información que, se busca y los intereses contrarios que se invaden. Págs. 586–588.

Por otra parte, el Juez señor Blackmun al concurrir con que efectivamente el público tiene un derecho constitucional de acceso a los juicios criminales manifestó que ". . . el público tiene una intensa necesidad y un merecido derecho de enterarse sobre la administración de la justicia en general, sobre el enjuiciamiento de los delitos locales en particular; sobre la conducta del juez, del fiscal, de los oficiales de la Policía, de otros servidores públicos y de todos los actores en la arena judicial; y sobre el juicio en sí". Pág. 604.

Nótese que aunque este caso no contiene una opinión del Tribunal en la cual fundar la aseveración de que el derecho de acceso o información ha sido explícitamente reconocido, sirve por lo menos para concluir que una mayoría de jueces de dicho Tribunal concurre con el criterio de que el sistema de libre expresión encarnado en la Primera Enmienda protege otros derechos importantísimos de los ciudadanos. Esto, de por sí, es suficiente. El hecho de que los jueces de ese alto foro no hayan podido ponerse de acuerdo en cuanto al modo de enunciar una fórmula de consenso no derrota su existencia.

La historia reciente de los Estados Unidos, matizada por serias tribulaciones políticas, ha demostrado la urgen-

cia de reconocer un derecho tan preeminente de la vida moderna. De hecho, tanto el Congreso de Estados Unidos como las distintas legislaturas estatales han ido reconociendo paulatinamente ese derecho al promulgar leyes sobre libertad ciudadana de información (*"Freedom of Information Act"* y *Sunshine laws"*).

El Profesor Emerson aboga por que los tribunales reconozcan que el derecho del pueblo de estar informado (*the right to know*) emana del sistema de libertad de expresión implícito en la Primera Enmienda.

> En mi opinión, la mayor contribución que podría hacerse a este reino total de las leyes es que los tribunales reconozcan explícitamente que el derecho constitucional de estar informado abarca el derecho del público de obtener información de parte del gobierno. . . . Es preciso que el público, como soberano, tenga toda la información disponible a fin de dar instrucciones a sus servidores, el gobierno. Como postulado general, para que la democracia funcione no se puede ocultar información; de otro modo se haría imposible la toma de decisiones finales por el pueblo, a quien corresponde dicha función. Sea que tal garantía del derecho de estar informado es el único propósito de la Primera Enmienda o no, sin duda es un elemento principal de dicha disposición y como tal debe ser reconocido. Emerson *op. cit.*, pág. 14.

C. *Limitaciones y Excepciones al Derecho de Acceso e Información*

El derecho de acceso y de recopilar información, al igual que otros, no puede ser absoluto. *Kleindienst* v. *Mandel*, supra. El Tribunal Supremo de Estados Unidos en ocasiones anteriores ha esbozado estándares de análisis para la legislación o disposiciones reglamentarias que incidan sobre el derecho a la libre expresión. En *United States* v. *O'Brien*, 391 U.S. 367, 377 (1968), sostuvo que una regulación gubernamental estaría suficientemente justificada si: (1) cae dentro del poder constitucional del Gobierno; (2) propulsa un interés gubernamental impor-

tante o sustancial; (3) el interés gubernamental no está relacionado con la supresión de la libre expresión; y (4) la restricción concomitante de los alegados derechos bajo la Primera Enmienda no es mayor que la esencial para propulsar dicho interés. Un estándar similar se siguió en *Procunier* v. *Martínez*, supra, págs. 413–414.

No hay duda de que una de las funciones más importantes del Estado es garantizar el orden público y aprehender y castigar a los infractores. Esta función de seguridad pública no podría ser descargada adecuadamente si el Estado no tuviera a su disposición todo un aparato investigativo capaz de resolver los crímenes que se cometan aislada pero rutinariamente, e igualmente capaz de descifrar el engranaje (a veces perfectamente acoplado) del crimen organizado y el terrorismo moderno. Ninguna sociedad civilizada, de inspiración democrática, puede asegurar su supervivencia sin leyes que la rijan y sin un aparato coercitivo mínimo que las haga cumplir.

De ahí que en términos generales se haya reconocido una restricción general al derecho de inspección de documentos públicos. "No hay un derecho general de inspección de documentos que, aunque de naturaleza pública, tengan que ser mantenidos en secreto y fuera de la inspección ordinaria, tales como la correspondencia diplomática, y las cartas y los despachos del servicio de detective de la Policía u otros relacionados con la captura y enjuiciamiento de delincuentes." Cross, *op. cit.*, pág. 78. No obstante, este mismo autor añade a renglón seguido: "Esta regla, que se ha formulado por vía de *dicta* con mucha más frecuencia de lo que en realidad se ha aplicado, está cacarañada por excepciones en decisiones, y más flagelada aún en la práctica actual, lo que armoniza con las realidades de la vida."

██ Si bien es cierto que el Estado puede restringir a la ciudadanía el derecho de acceso a los expedientes investigativos, también es cierto que no puede impedir

absolutamente dicho acceso con solo invocar el hecho de que se trata de un récord policial.

Consecuentemente, opinamos que la Asamblea Legislativa puede aprobar legislación para sustraer del escrutinio público determinados documentos e informes que estén ligados a la fase investigativa o preventiva del crimen y que por su naturaleza pongan innecesariamente en riesgo los resultados de una investigación en curso, la vida de informantes, confidentes y testigos, así como la de los propios empleados y funcionarios del Estado, o que de cualquier otro modo afecten verdaderamente la seguridad pública. No obstante, como excepción al fin, toda legislación que pretenda ocultar información a un ciudadano bajo el palio de la confidencialidad debe ser interpretada restrictivamente a favor del derecho del pueblo a mantenerse informado. Dicha legislación, como cualquier otra que incida sobre derechos fundamentales, tiene que justificarse a plenitud y contener normas claras y precisas que permitan identificar adecuadamente el material y las circunstancias en que habrá de aplicarse la norma de accesibilidad. *En otras palabras, ninguna legislación que no contenga estándares apropiados para determinar el tipo de documento e información que habrá de estar sujeta al escrutinio público y que, por el contrario, establezca una norma de confidencialidad absoluta, puede superar el rigor de la cláusula constitucional en discusión.*

Del análisis y estudio expuesto, somos de opinión que el estándar judicial adoptado en *O'Brien* y en *Procunier*, supra, satisface adecuadamente el balance que debe existir entre el derecho de un ciudadano de tener acceso a documentos públicos y el interés del Estado en proteger los expedientes investigativos y policiales. En ese sentido, debemos recalcar que en lo concerniente a las investigaciones de corrupción de empleados y funcionarios públicos, de crimen organizado y de terrorismo, hay que reconocer ab initio el poder del Estado de restringir el

acceso a documentos, papeles o memoriales que se generen en el curso de una investigación de esta naturaleza. No hace falta mucho esfuerzo mental para comprender el interés legítimo y esencial que tiene el Estado en esta parte de la administración y seguridad pública. Lo que debe ocupar nuestra atención es si, en realidad, el efecto incidental de la restricción sobre el derecho de acceso es mayor que el esencial para llevar a cabo el fin legítimo de la legislación impugnada, en vista de que el interés del Estado está íntimamente ligado a la norma de inaccesibilidad de los expedientes policiales.

## III

*ANÁLISIS CONSTITUCIONAL DEL ARTÍCULO 13 DE LA LEY NÚM. 38.*

La ilustrada sala sentenciadora, luego de delimitar la controversia ante sí —estrictamente de derecho— "a determinar si los documentos solicitados por los demandantes —declaraciones juradas, protocolos de autopsia, fotografías, grabaciones que contengan declaraciones de testigos e informes de laboratorio— son documentos públicos, y por tanto susceptibles de ser inspeccionados y fotocopiados por los ciudadanos que así lo soliciten" concluyó *correctamente* en la afirmativa, pero salvo los protocolos de autopsia y fotografías relacionadas, negó su acceso en virtud del Art. 13 de la Ley Núm. 38 de 13 de julio de 1978 —privilegio de la información oficial— cuya constitucionalidad sostuvo. El precepto reza:

> *Toda la información bajo la custodia del Negociado estará clasificada en categorías de confidencialidad, por un término de treinta (30) años, estableciéndose como mínimo la categoría de "confidencial".* Solo el Director *con la aprobación del Secretario* [de Justicia] o el Gobernador, *podrá autorizar la divulgación de información relacionada con el funcionamiento, operación o actividades de este Negociado.* Cualquier empleado, funcionario u oficial o persona que por

descuido u omisión, o deliberadamente, ofreciere información, diere a la publicidad o públicamente comentare cualquier acción, actividad, investigación o acto oficial de este Negociado, será culpable de delito grave y convicto que fuere se le impondrá pena de reclusión por un término mínimo de dos (2) años y máximo de cinco (5) años. (Énfasis nuestro.) 3 L.P.R.A. sec. 138*l*.

 Al examinar la constitucionalidad de esta disposición, por su íntima relación con el derecho a la libertad de expresión y libre flujo de ideas, se impone un análisis de estricto escrutinio judicial. *Zachry Int.* v. *Tribunal Superior*, 104 D.P.R. 267 (1975).

Lo primero que se pone de manifiesto es que el Art. 13 clasifica *toda la información bajo la custodia* del N.I.E. como *confidencial*. Dicha categoría de confidencialidad se extiende por treinta años. Solamente el Director de la agencia, con la aprobación del Secretario de Justicia o el Gobernador de Puerto Rico puede autorizar la divulgación de la información.

Los apelantes señalan que el lenguaje "toda la información" es excesivamente amplio y ambiguo. Es excesivamente amplio en cuanto extiende el sello de confidencialidad a la *totalidad* de la información *bajo la custodia* del N.I.E., y es ambiguo porque no define lo que la ley quiso incluir bajo el término *información*. En atención a ese señalamiento el tribunal sentenciador concluyó:

. . . El carácter del lenguaje empleado en la ley es excesivamente amplio y creemos que debemos limitar su ámbito. A nuestro juicio, debe ser confidencial sólo aquella información que entre en los archivos del Negociado en virtud de una investigación realizada por este organismo.

No es difícil coincidir en que dicho lenguaje en verdad es excesivamente amplio y ambiguo. El Estado apelado, sin embargo, sostiene que como el foro de origen —a tenor con el pronunciamiento en su sentencia antes transcrita— ordenó que el N.I.E. produjera varios protocolos de autopsia y fotografías relacionadas, curó con dicha "sencilla

interpretación judicial" cualquier vicio de la legislación. No estamos de acuerdo.

Precisamente, el mejor argumento de que la ley impugnada es *excesivamente amplia y ambigua* es que dicho lenguaje coloca forzosamente en manos del tribunal, y no de la agencia, decidir que allí donde dice "toda" lee "alguna", y donde reza "información" no dice "protocolo de autopsia", y ello desde luego, a base de criterios para ser aplicados caso a caso. Nuestra función apelativa no debe ser ir por encima del texto *claro* limitante de la ley para enfrascarnos en consideraciones ad hoc de cuál información está disponible o no para inspección. Nuestra misión rectora es resolver si determinada información está cubierta por el manto de secretividad y, de estarlo, si ello es compatible con el ejercicio de derechos constitucionales protegidos. No se trata en este caso de llenar los intersticios de la ley, sino, más bien, de hacer labor de prótesis. Adviértase que aun la norma adoptada por la sala de instancia, carente de parámetros de tiempo, propósito, uso y otros factores, no logra superar el innecesario peligro de la ambigüedad: "información que entre a los archivos del Negociado en virtud de una investigación realizada por este organismo." Bajo ese enfoque quedan las siguientes interrogantes: ¿Cómo justificarse que se restrinja materia de naturaleza investigativa una vez usada en el procedimiento o para los propósitos que se recopiló? ¿Cómo sostenerse el imprimátur legislativo de *confidencialidad* absoluta, solo exenta por acción del ejecutivo sin ninguna otra consideración?

La excesiva amplitud y vaguedad del lenguaje tampoco se cura con la ilimitada discreción que el estatuto confiere al Secretario de Justicia y al Gobernador para aprobar la divulgación de información clasificada a priori "confidencialmente".

No se salva la constitucionalidad a base de estimar que son criterios limitativos el lenguaje legal de que los

poderes y funciones "se ejercerán con la mayor *prudencia* y *mesura* y dentro de los límites *razonables* y estrictamente necesarios" conforme a los propósitos de la ley. Art. 4 (3 L.P.R.A. sec. 138c). Primero, a poco se examine el argumento, notaremos que no son per se criterios limitantes. El que el poder público descargue sus funciones con *prudencia y mesura dentro de los límites de los objetivos de un estatuto* es una premisa implícita en toda encomienda legislativa. Difícilmente podemos concebir un mandato legislativo de implementar una ley de forma imprudente, desmesurada o irrazonable. El que ello se haya consignado expresamente no varía ese derrotero como tampoco ningún escollo legal. Segundo, prudencia, mesura y razonabilidad más bien son sinónimos —en el campo de la semántica— de unos atributos. Ciertamente resultan insuficientes como parámetros o guías legislativas restrictivas a una prohibición absoluta como la que nos ocupa.

Cuando, como en el caso de autos *no hay estándares* en la ley que gobiernen el ejercicio de la discreción que la ley reconoce, el esquema permite y promueve una aplicación arbitraria y discriminatoria de la ley. *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 170 (1972). Los funcionarios concernidos ni siquiera han promulgado normas de ninguna naturaleza que regulen el ejercicio de tal discreción de modo que pudieran sostener que la ausencia de parámetros apropiados ha sido subsanada por una reglamentación adecuada. Como se sabe, el ejercicio de poderes administrativos a base de consideraciones caso por caso, no a base de una ley o de un reglamento, adolece del defecto constitucional de ambigüedad (*vagueness*). *Pennsylvania St. Board of Phy.* v. *Cohen*, 292 A.2d 277, 282 (1972).

Lo expuesto no significa que una agencia administrativa no pueda aprobar cierta reglamentación al amparo de una ley de estándares ambiguos. Más bien lo que quiere decir es que una agencia no puede hacer

determinaciones individuales sin antes promulgar regulaciones que le den sentido a cualquier ambigüedad en el estatuto. El profesor Davis lo expresa de este modo:

> . . . El tribunal puede permitirle a la agencia formular sus reglas bajo la norma estatutaria imprecisa (*vague*), pero el tribunal puede prohibirle tomar determinaciones individuales sin antes hacer lo que razonablemente pueda hacer, mediante formulación de reglas u otro modo, para darle un significado específico a la norma estatutaria imprecisa (*vague*). *Administrative Law Treatise*, 2da ed., San Diego, K. C. Davis Pub. Co., 1978, Vol. I, pág. 182.

La sentencia recurrida pone demasiado énfasis en la facultad del Estado de excluir del escrutinio público algunas clases de expedientes públicos y cita, como ejemplo, las nueve excepciones que contiene la Ley Federal de Libertad de Información —5 U.S.C. 552— que consignan las únicas circunstancias por las cuales el gobierno federal no tiene que revelar cierta información. Una de estas excepciones excluye la divulgación de información que por legislación especial se considera confidencial. No podemos coincidir con ese enfoque. Distinto a nuestro Art. 13 —en que la secretividad absoluta solo puede ceder a una divulgación discrecional— la Sec. 552(b)(3) del estatuto federal se erige sobre una base relativa y razonable. A tales efectos exime de divulgación aquellos documentos que específicamente mediante ley "no se puedan divulgar, siempre que dicha ley (A) requiera que esos asuntos no sean revelados al público, de modo tal *que no se deje al arbitrio de alguien su divulgación* o (B) *establezca unos criterios particulares para que no se divulguen* o se refiera a determinados tipos de asuntos que no han de ser dados a conocer". Vemos, pues, que la disposición de la mencionada ley federal contiene estándares adecuados y precisos que excluyen al máximo todo riesgo de capricho y arbitrariedad de parte de las agencias concernidas para negar o acceder a suministrar la información.

De importancia cardinal, en lo referente a la excepción particular sobre "récords investigativos", la propia Sec. 552(b)(7) reza:

La exención actual aplica a expedientes de investigación recopilados con el propósito de hacer cumplir las leyes, pero sólo hasta el punto que producir dichos expedientes (A) interfiera con los procedimientos para imponer las leyes, (B) prive a alguien del derecho a un juicio justo o a una sentencia imparcial, (C) constituya una intrusión injustificada de la privacidad, (D) revele la identidad de una fuente confidencial y, en el caso de un expediente recopilado por alguna entidad para el cumplimiento de la ley penal en el curso de una investigación criminal, o por una agencia que realice una investigación legal de inteligencia con respecto a la seguridad nacional, información confidencial suministrada sólo por la fuente confidencial, (E) revele técnicas y procedimientos investigativos, o (F) ponga en peligro la vida o la seguridad física del personal que hace cumplir las leyes. (Traducción nuestra.)

Nuevamente el esquema contenido en la ley federal —aunque reconoce una amplia discreción a los administradores en esas áreas expresamente mencionadas— consigna estándares más o menos específicos que guían de algún modo tal discreción, de suerte que su ejercicio no sea producto del capricho sino de un ponderado balance de los intereses en conflicto. Aunque admitimos que no puede esperarse que un estatuto sea un catálogo minucioso de todos los documentos sujetos a inspección o reserva —tarea que no puede exigírsele al Poder Legislativo, *FAA Administrator* v. *Robertson*, 422 U.S. 255 (1974)— no por ello debemos convalidar un estatuto situado precisamente en el extremo opuesto, carente de normas generales mínimas para regir la discreción administrativa.

Por otro lado, observamos que el Art. 13 de la legislación impugnada tampoco contiene garantías procesales adecuadas para revisar decisiones administrativas que vulneren derechos fundamentales de los ciudadanos. Distinto a la ley federal en cuestión, nuestro estatuto ni

siquiera provee para que los tribunales supervisen la discreción administrativa que pudiera ejercerse en forma arbitraria o caprichosa. No hay diseño legal para una inspección en "cámara" por el poder judicial de los documentos u objetos cuya diseminación se solicita y ha sido denegada. La norma establecida en el referido Art. 13 pretende que la decisión de los administradores —Gobernador o Secretario de Justicia, según sea el caso— sea final e irrevisable, y esté exenta de cualquier posible ingerencia de parte de los tribunales.

El manto de secretividad que por treinta (30) años habrá de cernirse sobre los documentos protegidos por la ley tampoco guarda proporción con el fin pretendido en la legislación. El examen de su escaso historial legislativo no arroja luz sobre su propósito. Lo menos que puede decirse es que treinta (30) años resulta ser un término excesivo e irrazonablemente amplio, pues nos es difícil concebir —en virtud de los términos prescriptivos para encauzar acciones criminales— una situación en que la utilidad de la confidencialidad se prolongue por un espacio mayor de algunos años. Esto, por supuesto, no significa que no existan documentos que deban incluirse en una categoría especial en que por razones excepcionales y extraordinarias, el lapso del tiempo no desvirtúe el valor y utilidad en sí de la información. Ahora bien, esta posibilidad no puede dar base a categorías generales de secretividad injustificadamente prolongadas. Sostenerlas como tal tendría el efecto de tolerar un diseño en que solamente el ciudadano tendrá acceso eventual a una información por el mero transcurso del tiempo. En otras palabras, el ciudadano sólo tendrá derecho de acceso por "prescripción extraordinaria" y no en virtud del propio derecho que emana del sistema de libre expresión proclamado en la Carta de Derechos de nuestra Constitución.

Se impone una reflexión final. En lo que a este caso concierne no podemos abstraernos de la realidad de que la

información que se pretende obtener del Estado está relacionada con la investigación que realizó una agencia pública sobre unos hechos que a fuerza de la amplia difusión que han tenido y de los procesos judiciales civiles que han generado, ha despertado el interés, no solamente de los peticionarios que instaron este recurso sino también de otros grupos de ciudadanos, algunos de afiliación político-partidista.

Hemos visto que el Estado fue demandado por un ciudadano particular en daños y perjuicios por los sucesos investigados por el N.I.E. El Tribunal Superior, Sala de Utuado, le impuso responsabilidad a base de que la actuación de los agentes de la Policía fue negligente, ya que pudiendo prevenir el suceso de sangre no lo hicieron. El Estado nunca apeló dicho dictamen. De igual modo en los dos informes preparados bajo la jurisdicción del Departamento de Justicia se exoneró a los policías y se concluyó que no se habría de procesar criminalmente a ninguna persona.

Bajo estas circunstancias no creemos que ninguna ley de confidencialidad absoluta pueda invocarse frente al derecho constitucional de la ciudadanía de obtener información de su gobierno que pudiera revelar conducta cuestionable, susceptible de desagravio.

Nuestra democracia proclama tener uno de los esquemas constitucionales más avanzados y plenos del mundo moderno que tolera y se nutre de la diversidad de ideas y de la divergencia de criterios. Aunque imperfecto, aspiramos a un sistema democrático de gobierno cuyo objetivo esencial sea garantizar la realidad de todos los derechos fundamentales del hombre. En nuestro país la Constitución y las leyes no solamente protegen al ciudadano modelo, sino también al infractor de la ley, independientemente de sus ideologías políticas. Aunque a veces la fluidez situacional exige que la Policía —en la protección de la vida o la propiedad— responda de la manera más enérgica

posible, la Constitución reconoce que todo acusado tiene derecho a la presunción de inocencia y a juicio por jurado aunque se le sorprenda in fraganti. Por eso, tan pronto se levanta una sospecha que macule la reputación democrática de pueblo civilizado la función del Estado debe ser expeditar el camino a los ciudadanos interesados —inclusive críticos y adversarios— en averiguar la verdad y no sembrar el camino de obstáculos. Ante la hermética resistencia del Estado a viabilizar el derecho de acceso a información, corresponde a los tribunales franquear el camino tomando en consideración, por supuesto, los intereses públicos y privados envueltos en la situación, y adoptando todas las medidas necesarias para conseguir los fines legítimos que perseguía la legislación invocada por el Estado.

▇ Decretamos que el Art. 13 de la Ley Núm. 38 de 13 de julio de 1978 es inconstitucional de su faz. Consecuentemente ordenamos la expedición del *injunction* solicitado, con sujeción a que el tribunal de instancia, mediante determinación en cámara, examine si la publicidad de algunos documentos solicitados no se justifica al amparo de las normas esbozadas en esta opinión.

En ausencia de un procedimiento establecido por ley para llevar a cabo privadamente la inspección en cámara, dispondremos el siguiente:

(a) El Secretario de Justicia, o la persona en quien éste delegue, someterá al tribunal de instancia una relación bajo juramento de todos los documentos obrantes en el Negociado de Investigaciones Especiales de su Departamento, que se hubieren producido o recopilado en el curso de la investigación del caso a que se contrae el presente recurso. No es necesario que dicha relación describa el contenido de los documentos, papeles, fotografías u otros objetos, pero deberán identificarse de manera apropiada;

(b) El Secretario o su delegado, a renglón seguido de dicha relación, especificará cuál o cuáles de esos documentos a su juicio no deben ser revelados, expresando

todas las razones que tuviere para ello. En cuanto a éstos, el tribunal podrá ordenar que el Secretario los produzca para ser inspeccionados por el juez privadamente con exclusión de las partes y sus abogados;

(c) Hecho el examen, el tribunal ordenará que el Secretario: (1) entregue copia de los documentos o papeles sobre los que no hubiere ninguna objeción o de aquellos que, a pesar de la objeción, el tribunal estime que no están protegidos por el fundamento de confidencialidad; y (2) denegará el acceso a los demás documentos, objetos o papeles. En todo caso, el tribunal tendrá amplia discreción para regular y dirigir estos procedimientos, de forma que se garantice que personas ajenas a la función judicial tengan acceso a aquellos documentos, si alguno, que no deban ser divulgados. *Cf. Ray* v. *Turner,* 587 F.2d 1187 (1978); *Military Audit Project* v. *Bush,* 418 F.Supp. 876 (1976); *Vaughn* v. *Rosen,* 484 F.2d 820 (1973); *Cuneo* v. *Schlesinger,* 484 F.2d 1086 (1973).

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Martín emitió opinión disidente y el Juez Asociado Señor Irizarry Yunqué emitió opinión concurrente y disidente en parte.

—O—

Opinión concurrente y disidente en parte emitida por el Juez Asociado Señor Irizarry Yunqué.

La opinión de este Tribunal declara inconstitucional de su faz el Art. 13 de la Ley Núm. 38 de 13 de julio de 1978 (3 L.P.R.A. sec. 138*l*).([1]) Considera que dicho artículo es

---

([1]) Dicho artículo dispone:

"Toda la información bajo la custodia del Negociado estará clasificada en categorías de confidencialidad, por un término de treinta (30) años, estableciéndose como mínimo la categoría de 'confidencial'. Sólo el Director con la aprobación del Secretario o el Gobernador, podrá autorizar la divulgación de información relacionada con el funcionamiento, operación o actividades de este Negociado. Cualquier empleado, funcionario u oficial o persona que por descuido u omisión, o deliberadamente, ofreciere información, diere a la publicidad o

impermisiblemente vago o ambiguo. No obstante, reconoce que no hay un derecho absoluto a inspeccionar los documentos en poder del Negociado de Investigaciones Especiales, y concluye dictando pautas para que el tribunal de instancia examine los documentos y determine a fin de cuentas cuáles se deben mostrar a los demandantes y cuáles no. Concurro en esta disposición del caso debido a la ausencia de reglamentación para dar vigencia a las disposiciones de la citada ley, pero no creo que se justifique decretar su inconstitucionalidad.

El derecho de la ciudadanía a tener acceso a información en poder del Estado ha sido objeto de varios casos resueltos por el Tribunal Supremo federal. En *Nixon* v. *Warner Comm., Inc.*, 435 U.S. 589 (1978), se dijo:

> Está claro que los tribunales de este país reconocen un derecho general a inspeccionar y copiar récords y documentos públicos . . . . El interés necesario para validar la expedición de un auto que ordene dicho acceso puede hallarse, por ejemplo, en el deseo de la ciudadanía de mantenerse alerta al funcionamiento de las agencias públicas.

En *Nixon* v. *Administrator of General Services*, 433 U.S. 425 (1977), al sostener la validez de la ley que limita acceso público a documentos presidenciales, dijo este Tribunal:

> Claro está, nosotros no estamos sordos a la petición del apelante de que reconozcamos las realidades políticas y sociales vigentes en 1974. Fue un período de turbulencia política sin precedentes en nuestra historia. Pero este Tribunal no tiene la libertad de invalidar las Leyes del Congreso a base de inferencias que se nos pide que derivemos de nuestra interpretación personal del ambiente contemporáneo y de la historia reciente. Al juzgar la

---

públicamente comentare cualquier acción, actividad, investigación o acto oficial de este Negociado, será culpable de delito grave y convicto que fuere se le impondrá pena de reclusión por un término mínimo de dos (2) años y máximo de cinco (5) años."

constitucionalidad de la Ley solamente podemos examinar sus términos, la intención expresada por los miembros del Congreso que votaron a su favor, y la existencia o ausencia de explicaciones legítimas de su efecto aparente.

En *Houchins* v. *KQED, Inc.*, 438 U.S. 1 (1978), rechazó el Tribunal Supremo reconocer un derecho absoluto bajo la Primera Enmienda o bajo la Enmienda Catorce y, aunque no hubo opinión en que concurriera una mayoría del Tribunal, la siguiente expresión de la opinión del Juez Presidente Burger representa el sentir mayoritario: [2]

No existe un derecho constitucional a tener acceso a información gubernamental específica, o que requiera la accesibilidad a la burocracia. [Citando *Pell* v. *Procunier*, 417 U.S. 817, (1974).] El interés público de estar al tanto de las acciones gubernamentales está protegido por la garantía a la libertad de prensa, pero la protección es indirecta. La Constitución no es una Ley de libertad de información ni una Ley sobre secretos oficiales.

En otras palabras, la Constitución suscita la controversia, pero no su solución. El Congreso puede, quizás en algunos casos, proveer una solución por medio de legislación cuidadosa. Para lo demás debemos depender, como ocurre a menudo en nuestro sistema, del tira y jala de las fuerzas políticas existentes en la sociedad norteamericana. Págs. 14 y 15.

En nuestra jurisdicción, ya en 1959 este Tribunal había reconocido el poder del Estado para mantener determinada información en confidencia, refiriéndose específicamente a determinados casos. Se dijo en *Sierra* v. *Tribunal Superior*, 81 D.P.R. 554, 577 (1959):

. . . [Tanto] el gobierno como los ciudadanos privados pueden invocar todos los privilegios que establecen las normas de evidencia. Pero es indudable que en un pleito civil ni el gobierno ni los funcionarios públicos tienen un

---

[2] Participaron siete jueces en la decisión. La expresión fue tomada de un artículo de Juez Stewart publicado en 26 Hastings Law Journal 631, 636 (1975), titulado *Or of the Press*. Así, esta expresión representa el sentir de cuatro de los siete jueces participantes.

privilegio general de no revelar información de carácter oficial. Sí pueden invocar privilegios específicos, relativos a: (1) *comunicaciones dirigidas a un funcionario público bajo reserva oficial, si la divulgación habría de resultar en perjuicio de los intereses públicos.* Art. 40 de la Ley de Evidencia, 32 L.P.R.A. sec. 1734; (2) *información secreta que afecte la seguridad pública del estado;* (3) comunicaciones hechas a un gran jurado, ya sea por un querellante o por un testigo; (4) *información sobre la identidad de personas que han suministrado pruebas tendientes* a descubrir la violación de una ley. (Énfasis suplido.)

El Art. 13 de la Ley Núm. 38, que aquí nos ocupa, no puede interpretarse aisladamente de las demás disposiciones de dicha ley. Y la ausencia de una reglamentación sobre las diferentes "categorías de confidencialidad" en que, conforme a dicho artículo, deberá clasificarse toda la información en poder del Negociado de Investigaciones Especiales creado por dicha ley no puede tomarse como signo de vaguedad, ni mucho menos para anular la voluntad legislativa. La ley no puede señalar a priori todos los casos específicos en que se justifica clasificar determinada información en alguna de dichas categorías. Compete así hacerlo al Poder Ejecutivo, por reglamentación, y los fines y propósitos de la ley, y todos los detalles que hay en sus numerosas disposiciones sobre las funciones y alcances del Negociado ofrecen adecuados parámetros para la necesaria reglamentación.

Para que pueda funcionar adecuadamente una agencia investigativa como la creada por la ley que nos ocupa es lógico que la información que la agencia recopile esté debidamente clasificada según su importancia, y que el acceso a dicha información esté limitado a determinadas personas. Habrá información que carezca de valor y pueda considerarse exenta de clasificación. Y habrá información de tal naturaleza sensitiva para la seguridad pública, que solamente deba estar accesible a funcionarios del más alto nivel. La clasificación tendrá que hacerse en cada caso sobre la

marcha. (³) La citada ley delega en el Ejecutivo la facultad de promulgar la necesaria reglamentación. Porque no se haya promulgado reglamentación alguna no podemos catalogar de vaguedad a la ley.

Considera este Tribunal, por otro lado, que el término de treinta años establecido en el Art. 13 a que nos estamos refiriendo es excesivamente largo y no guarda proporción con el fin pretendido en la legislación. ¿Qué término consideraría este Tribunal como razonable? ¿Compete a este Tribunal así disponerlo? No creo que tengamos los elementos de juicio necesarios para decidirlo. Además, la ley debe interpretarse de la manera más favorable a su validez. A mi juicio, el término de treinta años dispuesto por el Art. 13 no puede interpretarse como un término absoluto aplicable a todas las clasificaciones de confidencialidad. Habrá información cuya confidencialidad pierda toda razón de ser en poco tiempo, y otra que deba mantenerse en confidencia por un término relativamente largo. Interpreto el término de treinta años como un período máximo; no como mínimo.

Reitero que la ausencia de reglamentación justifica que en este caso se dispongan los medios para que el tribunal de instancia examine la información que los demandantes desean y, oído el Secretario de Justicia, determine en cada caso qué información puede ser suministrada. Las normas que se disponen en la opinión me parecen adecuadas para garantizar un justo balance entre los intereses del Estado y el derecho de estos ciudadanos a obtener información. No me parece que sea necesario, sin embargo, ir tan lejos como para anular lo dispuesto por la Asamblea Legislativa.

---

(³) Para fines de ilustración, compárese la Orden Ejecutiva Núm. 12065, promulgada por el Presidente de los Estados Unidos en 28 de junio de 1978 (50 U.S.C.A. sec. 401) sobre *"National Security Information"*.

—O—

Opinión disidente emitida por el Juez Asociado Señor Martín.

El Art. 13 de la Ley que crea el Negociado de Investigaciones Especiales del Departamento de Justicia (N.I.E.) (¹) dispone que:

> Toda información bajo la custodia del Negociado estará clasificada en categorías de confidencialidad, por un término de treinta (30) años, estableciéndose como mínimo la categoría de "confidencialidad". Sólo el Director con la aprobación del Secretario o el Gobernador, podrá autorizar la divulgación de información relacionada con el funcionamiento, operación o actividades de este Negociado. Cualquier empleado, funcionario u oficial o persona que por descuido u omisión, o deliberadamente, ofreciere información, diere a la publicidad o públicamente comentare cualquier acción, actividad, investigación o acto oficial de este Negociado, será culpable de delito grave y convicto que fuere se le impondrá pena de reclusión por un término mínimo de dos (2) años y máximo de cinco (5) años.

El Tribunal declara hoy inconstitucional de su faz el citado Art. 13 por el fundamento de que es impermisiblemente amplio y vago. Disiento de este dictamen por entender que constituye una aplicación incorrecta e innecesaria de la doctrina de inconstitucionalidad de una ley por ser excesivamente amplia o vaga. Al dejar al N.I.E. sin la facultad que le concedió la Asamblea Legislativa de mantener la confidencialidad de la información bajo su custodia, el Tribunal curiosamente reconoce que hay circunstancias en las que la confidencialidad estaría justificada. Procede el Tribunal entonces a llenar el vacío resultante, sustituyendo el invalidado concepto legislativa de confidencialidad por unos criterios de confidencialidad de creación judicial. Bajo las circunstancias de este caso no era necesario, ni constitucionalmente requerido, llegar a ese resultado.

---

(¹) Ley Núm. 38 de 13 de julio de 1978 (3 L.P.R.A. sec. 138*l*).

En primer lugar, de acuerdo a la ley que crea el N.I.E. esta es una unidad especializada con el encargo de investigar esencialmente dos tipos de actividades: 1) aquellas relacionadas con el "crimen organizado", y 2) las llamadas "delictivas" que puedan afectar al gobierno, la propiedad o a los funcionarios públicos y la seguridad del Estado.

Comoquiera que los hechos ante nuestra consideración están vinculados a cierta información proveniente del segundo grupo de actividades de investigación, *i.e.* las delictivas, debemos circunscribirnos a examinar la aplicación del Art. 13, *supra*, sobre las investigaciones referentes a dichas actividades. No es prudente, pues, extender el dictamen de inconstitucionalidad del Art. 13, *supra*, hasta incluir su aplicación sobre cualesquiera investigaciones que pudieren estar relacionadas con las actividades relacionadas con el crimen organizado.

En segundo lugar, la facultad que el Art. 13 concede a sus administradores para decidir si mantienen la confidencialidad(2) de determinada información o permiten su divulgación no está carente de criterios limitativos. La Ley Núm. 38, *supra*, dispone en su Art. 4 (3 L.P.R.A. sec. 138c):

> Los poderes y funciones señalados en [esta Ley] se ejercerán con la mayor *prudencia* y *mesura* y dentro de los límites *razonables* y estrictamente necesarios conforme los fines que se persiguen con la creación del Negociado de Investigaciones Especiales.

Presumiendo, para fines de argumentación, que existe un derecho constitucional a tener acceso a información en manos del gobierno, las doctrinas que aconsejan ejercer con prudencia la facultad de interpretar y examinar la validez

---

(2) Aunque la ley permite clasificar la información en diversas "categorías de confidencialidad", para efectos de los demandantes, la categoría de mínima confidencialidad permitida —la de "confidencialidad"— es la pertinente, pues es suficiente para impedirles el acceso a la información.

constitucional de las leyes(3) nos obligan a interpretar estos criterios estatutarios a la luz de los estándares constitucionales aplicables, para así salvar la constitucionalidad del estatuto.(4) De no ser esto posible, procedería examinar si lo que resulta ser contrario a la Constitución es la aplicación de la ley a los hechos específicos y a las partes que están ante el Tribunal.(5)

En el presente caso el tribunal de instancia no examinó la determinación del funcionario administrativo de no permitir el acceso a la información solicitada por los demandantes, a la luz de los criterios estatutarios del Art. 4. Tampoco se planteó directamente la inconstitucionalidad

(3) Véanse *Pacheco* v. *Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979); *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250, 278 (1978); *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 271 (1975); *Mari Bras* v. *Alcaide*, 100 D.P.R. 506, 513 (1972); *Pueblo ex rel. M. G. G.*, 99 D.P.R. 925, 927 (1917); *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–596 (1958).

(4) *Negrón Soto* v. *Gobernador*, 110 D.P.R. 664 (1981); *Galarza Soto* v. *E.L.A.*, 109 D.P.R. 179 (1979), escolio 1; *Martínez* v. *Tribunal Superior*, 81 D.P.R. 945, 953 (1960); *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 596 (1958); *Pueblo* v. *Mantilla*, 71 D.P.R. 36 (1950).

(5) En *Bates* v. *State Bar of Arizona*, supra, el Tribunal Supremo de Estados Unidos señaló que "[la doctrina de inconstitucionalidad de la faz de una ley por ser excesivamente amplia] ha sido descrita por esta Corte como 'medicina fuerte' que 'ha sido empleada como último recurso', *Broadrick* v. *Oklahoma*, 413 U.S. a la pág. 613". Según el propio caso de *Bates* y según Lawrence H. Tribe, *American Constitutional Law*, Mineola, New York, The Foundation Press, Inc., 1978, Secs. 12-24 y 12-25, la doctrina se aplica cuando no es posible hacer valer el mandato constitucional mediante una adjudicación caso a caso limitada a los hechos y las partes ante el Tribunal, porque la ley en su amplitud produce un efecto paralizante que inhibe conducta o actividad constitucionalmente protegida, lo cual impide que los tribunales intervengan para reconocer dicha protección a menos que los afectados se sobrepongan al efecto paralizante y pretendan realizar la actividad protegida. En esas circunstancias se hace necesario que el Tribunal elimine el efecto paralizante, invalidando la ley y extendiendo así la protección constitucional a personas que no están ante sí. El Art. 13 no produce efecto paralizante alguno. Nada impide que las personas que crean tener derecho constitucional a acceso a información que el N.I.E. mantiene en confidencialidad al amparo del Art. 13, acudan a los tribunales a alegar ese derecho.

La doctrina de vaguedad, bajo la cual se invalidan leyes que producen el efecto paralizante porque no son claras en cuanto a cuál es la actividad restringida y cuál es la permitida, Tribe, *supra*, Sec. 12-28, tampoco es de aplicación en este caso.

del Art. 13, por lo que no tuvo el Estado la oportunidad de señalar y probar específicamente los intereses que pudieran justificar que se mantuviese la confidencialidad de cada una de las piezas de información en controversia, aun por encima de los derechos constitucionales que pudieran tener los demandantes.

Precisaría devolver el caso al tribunal de instancia para que una vez haga un examen en cámara, y en ausencia de las partes, de las piezas de información concernidas, si lo considerare necesario,[6] determine si la facultad de permitir o impedir la divulgación de información ha sido ejercida con prudencia y mesura, a tenor con los criterios estatutarios de necesidad y razonabilidad conforme a los propósitos enumerados en la ley. Art. 4, Ley Núm. 38, *supra*. Si en efecto determinase que aun bajo estos criterios el acceso a cierta información puede ser restringido, deberá determinar si dicha restricción es constitucionalmente permisible, atendiendo las circunstancias y criterios pertinentes.

Por las razones expuestas devolvería el caso al tribunal de instancia para la continuación de los procedimientos en la forma y manera expuesta precedentemente.

---

[6] El que la ley disponga que sólo el Director del Negociado, con la aprobación del Secretario de Justicia o del Gobernador, puede autorizar la divulgación de información, no puede operar para impedir que los tribunales ejerzan su función de examinar si la determinación de los administradores ha cumplido con los mandatos estatutarios y constitucionales. "Bajo nuestro sistema constitucional la Asamblea Legislativa no puede impedir directa o indirectamente, que los tribunales de justicia ejerzan sus facultades revisoras, en casos en que se ha actuado, o puede actuarse, por las agencias administrativas en forma contraria a imperativos preceptos constitucionales." *Hernández Montero* v. *Cuevas, Director*, 88 D.P.R. 785, 803 (1963). Para poder ejercitar cabalmente su función, es menester que el tribunal pueda examinar, si es necesario, aquellas piezas de información sobre las que se reclama la necesidad e interés de mantener la confidencialidad. *Cf. United States* v. *Nixon*, 418 U.S. 683 (1973), en donde se sostuvo la precedencia de un examen *in camera* de documentos presidenciales por sobre una alegación de privilegio o inmunidad presidencial, "en ausencia de una alegación de la necesidad de proteger secretos militares, diplomáticos o de seguridad nacional", pág. 706.