SERGIO PEÑA CLOS, apelante, *v.* DESIDERIO CARTAGENA ORTIZ, apelado.

*Número:* O-83-327        *Resuelto:* 3 de octubre de 1983

*Marcos A. Ramírez, Marcos A. Ramírez Lavandero, Héctor Rivera Cruz* y *José Ariel Nazario Álvarez,* abogados del apelante; *Héctor Urgell Cuebas,* abogado del apelado.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

En *Soto* v. *Srio. de Justicia,* 112 D.P.R. 477 (1982), consideramos aspectos de la libertad ciudadana de información frente a la Rama Ejecutiva. Este caso plantea una cuestión distinta, nueva en esta jurisdicción: el alcance del poder de investigación de una comisión legislativa frente a una agencia ejecutiva del Gobierno. La Comisión de lo Jurídico del Senado solicitó de la Policía de Puerto Rico determinados documentos relacionados con los sucesos acaecidos en el Cerro Maravilla el 25 de julio de 1978. Se le negaron. Resolvemos que la Comisión tiene derecho a ellos.

I

*Los hechos.*

El 23 de febrero de 1981 el Senado de Puerto Rico aprobó la Resolución Núm. 91, en que ordena a la Comisión de lo Jurídico (Sec. 1) que realice una investigación abarcadora sobre "[t]odo lo ocurrido en el Cerro Maravilla el 25 de julio de 1978 con respecto a la muerte de los jóvenes Carlos Soto Arriví y Arnaldo Darío Rosado"; "los antecedentes de lo ocurrido . . . incluyendo las actividades de los dos jóvenes con anterioridad al citado día, las actividades de la Policía y de los agentes encubiertos y las actividades de otros funcionarios del gobierno de Puerto Rico que pudieran tener relación con la planificación, organización y dirección del operativo del Cerro Maravilla"; "[t]odas las actividades de funcionarios policíacos y de otras dependencias del poder ejecutivo durante el día 25 de julio de 1978 y con posterioridad a ese día que puedan tener relación con la investigación de lo ocurrido . . . y con cualquier intento de cualquier funcionario para encubrir lo ocurrido en el Cerro Maravilla y proteger a los participantes de cualquier acción en su contra"; y "de los procedimientos y prácticas generales usadas por el cuerpo de la policía de Puerto Rico en el uso de los agentes encubiertos . . . independientemente de lo ocurrido en el Cerro Maravilla el día 25 de julio de 1978". Una vez terminada la investigación, la Comisión habría de someter a la consideración del Senado "la legislación que recomiende con motivo de sus determinaciones de hecho y del conocimiento adquirido por la investigación aquí ordenada".

En diciembre de 1981 la Comisión requirió del señor Desiderio Cartagena Ortiz, Superintendente de la Policía, la entrega de diversos documentos, entre los que se contaban los siguientes:

1. El manual interno sobre el reclutamiento y supervisión de informantes y agentes encubiertos.

2. El libro de entradas y salidas de los oficiales de inteligencia del Cuartel General en Hato Rey, desde el 19 de julio al 10 de agosto de 1978.

3. La misma información expuesta en el apartado anterior, pero perteneciente a la Oficina de Inteligencia de Ponce.

4. El nombre y la fotografía de los agentes que integraban la Oficina de Inteligencia entre el 1 de abril y el 31 de agosto de 1978.

5. La misma información solicitada en el apartado anterior, mas la relativa a la Oficina de Inteligencia de Ponce.

El señor Superintendente proveyó cierta información, mas se negó a entregar la información resumida por entender que los documentos que la contenían eran confidenciales y que su divulgación afectaría la seguridad y el interés público, especialmente porque se descubriría información sobre la identidad del personal que trabaja o ha trabajado como agente encubierto de la Policía.

El 18 de marzo de 1982 la Comisión aprobó una resolución en la que expresó que la información retenida por el señor Superintendente "es fundamental para el desempeño de su función investigativa" y "necesaria para que la Comisión pueda cumplir con el mandato de la Sección 1 [antes resumida] . . . de la Resolución del Senado Núm. 91". Se solicitó a continuación del Hon. Presidente del Senado que, en representación del Senado y la Comisión, iniciase la acción legal correspondiente para obtener la información restante.

Así se hizo, requiriéndose en la demanda al efecto la entrega por el señor Superintendente de la Policía de los documentos antes descritos. En la vista celebrada ante el Tribunal Superior la representación legal del Senado aclaró que "no estamos solicitando, Su Señoría, los nombres de los agentes, ni la lista de los agentes encubiertos, informantes o confidentes, nosotros estamos solicitando la lista de los agentes regulares, oficiales de la Oficina de Inteligencia".

(Ap. 236.) El Tribunal Superior ordenó el suministro de los documentos. En alzada, devolvimos el caso a instancia por considerar que nuestra intervención sería prematura sin el previo examen de los documentos por el Tribunal Superior.

De vuelta al Tribunal Superior, éste determinó que el manual interno a que nos referimos antes contiene seis órdenes de documentos: del I(A) al I(F). El grupo I(E) consiste en "Una serie de memorandos internos que contienen las claves, cambio de claves de confidentes para las distintas áreas operacionales que para efectos de la Policía se divide la Isla". El grupo I(F) está compuesto de: "Documentos que contienen las claves asignadas a cada área, los nombres de los confidentes, número de clave correspondiente al Área Metropolitana de San Juan, efectivo al 1 de julio de 1968, los nombres, rango, placa y prefijo asignado a personal de inteligencia de la Oficina de Inteligencia de la Policía de Puerto Rico, la misma información anterior pero para el área Norte, Sur y Este al 18 de junio de 1968." El tribunal resolvió que los documentos I(A), (B), (D), (E) y (F) deben mantenerse confidenciales "por estar vinculados a la fase investigativa y preventiva del crimen y por contener nombres de confidentes, de agentes encubiertos y los números de claves utilizados, nombre del personal de inteligencia asignado a la Oficina de Inteligencia de la Policía de Puerto Rico y a las distintas áreas (Norte, Sur, Este y Oeste) con sus números de claves". Explicó el Tribunal que "Deben mantenerse confidenciales dichos documentos para garantizarle a la Policía la secretividad de la metodología seguida en la investigación y prevención del crimen, pues de lo contrario se le dificultaría *un tanto* a dicho cuerpo la labor de perseguirlo". (Énfasis nuestro.) Respecto a los documentos I(F), el tribunal señaló que había que evitar poner en riesgo la vida de los confidentes y agentes encubiertos.

El tribunal permitió, del otro lado, el examen de los documentos denominados I(C), I(D) y los documentos restantes requeridos, numerados del 2 al 5 en este resumen de

los hechos, mas sujeto a dos condiciones. El examen podrá efectuarse únicamente por dos miembros de la Comisión, uno de mayoría y otro de minoría, y "bajo ninguna circunstancia se le podrá dar publicidad a la identidad de los agentes que aparecen en los listados, así como tampoco se podrán reproducir dichos listados, las fotografías ni los libros de entradas y salidas". El Senado ha acudido en alzada ante este foro.

## II

*La índole de la controversia.*

Antes de enumerar las cuestiones que plantean los hechos reseñados es preciso recalcar que no se están solicitando aquí nombres de agentes encubiertos, informantes o confidentes, ni claves de confidentes o de áreas. Hemos citado la aclaración efectuada al efecto en instancia por la representación legal de la parte recurrente. En su escrito de apelación ante este Tribunal, el Senado reitera que no está solicitando los documentos incluidos en los grupos I(E) y I(F) que hemos descrito antes. La orden del Tribunal Superior es en consecuencia enteramente oficiosa y superflua en cuanto declara confidenciales tales documentos y prohíbe su examen o entrega. Es cierto que el Senado obtuvo del Departamento de Justicia, según nos indica, por otros procedimientos legítimos, parte de esa información, mas no se ha incoado ante los tribunales procedimiento alguno para intentar regular su uso, si es que se teme que ha de usarse mal.

Los hechos de este caso presentan las siguientes interrogantes principales: ¿Cuál es la dimensión del derecho de una comisión legislativa de investigar y requerir de una agencia ejecutiva la producción de documentos? ¿Se trata de un derecho absoluto o limitado? ¿Quién fija sus limitaciones, si alguna? ¿Qué criterios o métodos rigen la tarea de delinear los contornos del derecho de investigar: la técnica de sopesar intereses u otra? ¿Qué papel juega en este caso la

doctrina del privilegio ejecutivo? ¿Puede una agencia ejecutiva negarse a revelar información cuya confidencialidad no haya sido establecida por ley? La prohibición de publicidad impuesta en la sentencia recurrida, ¿está permitida por el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado, que consagra la libertad de expresión?

### III

*El examen de los planteamientos.*

El análisis de varias de las cuestiones planteadas por este recurso exige el repaso previo del origen y desarrollo del poder legislativo de investigación. Ya que nuestra Asamblea Legislativa y otras estructuras básicas del Gobierno derivan mayormente de fuentes norteamericanas, es al Derecho común al que debemos acudir inicialmente para realizar lo indicado. Luego discutiremos el papel de la Constitución del Estado Libre Asociado y de otros materiales relacionados en el examen de estos asuntos.

A. *El trasfondo histórico del poder legislativo de investigación.*

Las raíces del poder de un cuerpo legislador o sus órganos para efectuar investigaciones, con facultad para citar testigos y compeler la presentación de documentos se remontan al Parlamento inglés del siglo XVI. J. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153, 159–160 (1926). Véanse, además, sobre el tema que nos ocupa en esta sección, R. Berger, *Executive Privilege: A Constitutional Myth*, Cambridge, Massachusetts, Harvard Univ. Press, 1974, págs. 15–48; R. Berger, *Congressional Subpoenas to Executive Officials*, 75 Colum. L. Rev. 865, 866–870 (1975).

Para 1688 los comités parlamentarios de investigación comienzan su verdadero desarrollo conforme el uso moderno. Cuarenta años más tarde representaban un mecanismo común al servicio del proceso legislativo. Las investiga-

ciones de actuaciones de la Rama Ejecutiva eran frecuentes. Landis, *op. cit.*, págs. 162-163.

Los cuerpos legislativos establecidos en las Trece Colonias asumieron desde el principio poderes sobre este particular análogos a los poseídos por la Cámara de los Comunes. Esta amplísima facultad de investigar fue cuestionada en corte varias veces, pero nunca fue negada o limitada antes de 1880. *Keeler* v. *McDonald,* 2 N.E. 615 (1885); Landis, *op. cit.*, págs. 167-168.

El Congreso de Estados Unidos ordenó su primera investigación en 1792: el estudio de las causas del desastre militar ocurrido al General St. Clair y su ejército en el Noroeste. 3 Ann. Cong. 490-494 (1792); Landis, *op. cit.*, pág. 170. Muy numerosas fueron las investigaciones realizadas en años siguientes. Los temas, algunos muy sensitivos, se distinguían por su variedad y su penetración en zonas íntimas de la acción ejecutiva: la administración del Departamento del Tesoro y la razón por la cual el Presidente le aceptó la renuncia al Tesorero en 1800, 10 Ann. Cong. 786 (1800); la conducta del Gobernador del Territorio de Mississippi, 10 Ann. Cong. 848 (1800); las relaciones, alegadamente maculadas de ilegalidad, entre el Departamento de la Guerra y el Comandante en Jefe del Ejército, 19 Ann. Cong. 1330-1331 (1809); las irregularidades, si alguna, en las cuentas de varios departamentos del Gobierno federal, 21 Ann. Cong. 1617 (1810); el alegado soborno de un destacado general del ejército, 21 Ann. Cong. 1606-1607 (1810); los desfalcos de otro, 31 Ann. Cong. 783-786 (1818). Década tras década las investigaciones abundaron sin que escaparan al escrutinio del Congreso o sus comisiones actos del Presidente y de miembros del Gabinete, según se desprende de los records del Congreso. Landis, *op. cit.*, págs. 175-194.

La primera decisión que impuso ciertos límites al poder de investigación del Congreso no ocurrió hasta el caso de *Kilbourn* v. *Thompson,* 103 U.S. 168 (1880), donde se exigió, en el contexto de la investigación de un ciudadano privado,

que la investigación debe responder a propósitos legislativos definidos. *Marshall* v. *Gordon*, 243 U.S. 521 (1917), refinó algo más el principio de que el poder de investigación no debe interferir con la Carta de Derechos, a la par que reafirmó la antigua práctica judicial de no sujetar la autoridad legislativa de investigación a la intervención de los tribunales. El Tribunal Supremo de Estados Unidos expresó en *Marshall*, pág. 545, que:

> . . . unless there be . . . a mere exertion of arbitrary power coming within the reach of constitutional limitations, the exercise of the [investigatory] authority is not subject to judicial interference.

*McGrain* v. *Daugherty*, 273 U.S. 135 (1927), envolvía, a distinción de *Kilbourn* y *Marshall*, la investigación por una comisión del Senado de la conducta del Procurador General o Secretario de Justicia de Estados Unidos y no de un ciudadano privado. El Tribunal Supremo rechazó la contención del Gobierno de que en tal situación la Comisión carecía de poder para obligar a un miembro del Gabinete a comparecer y testificar ante ella. El Tribunal citó la práctica establecida en contrario por siglos en Inglaterra y las colonias, concluyendo:

> We are of opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function. It was so regarded and employed in American legislatures before the Constitution was framed and ratified . . . . A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Págs. 174–175.

La doctrina establece una importante diferencia de grado entre *Marshall* y *McGrain*, fundada en la persona o entidad objeto de la investigación. Se ha afirmado, en consecuencia, tras discutir ambos casos, que:

Thus, judicial review was limited to inquiry whether the particular investigation was within the jurisdiction of Congress and whether the demand for information was consistent with Bill of Rights guarantees. Congressional subpoenas to executive officials, however, involve considerations that differ from those present in the private individual subpoena context and call for a greater degree of judicial restraint. Berger, *Congressional Subpoenas*, supra, págs. 869–870.

*Tenney* v. *Brandhove*, 341 U.S. 367 (1951), limitó severamente la regla de *Kilbourn*. El peticionario en *Tenney* argumentó que la investigación legislativa en curso contra él no se estaba celebrando para un propósito legislativo sino con el fin de intimidarle. El Tribunal resolvió, por voz del juez Frankfurter:

Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. *Courts are not the place for such controversies.* Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a[n] usurpation of functions exclusively vested in the Judiciary or the Executive. (Énfasis nuestro.) Págs. 377–378.

■ Hasta aquí las sentencias principales emitidas por el Tribunal Supremo de Estados Unidos antes de la aprobación de la Constitución del Estado Libre Asociado. Para el momento en que se formula nuestra carta fundamental el poder de investigación de la Rama Legislativa se concebía, por tanto, en la forma siguiente:

1° El referido poder, de tan antigua estirpe, era extraordinariamente amplio, especialmente cuando el blanco de

la investigación no era un ciudadano particular en su capacidad privada, sino una agencia o funcionario público.

2° El poder de investigación era secuela y parte indispensable del propio poder de legislar. Su fuente constitucional era éste.

3° Aunque el poder de investigación era muy amplio, no era un poder absoluto.

4° Las limitaciones de ese poder no eran definibles por la Rama Ejecutiva. Se desconocía por entero la noción del "privilegio ejecutivo". La frase no se acuña, en efecto, hasta 1958. Berger, *Executive Privilege*, supra, pág. 1.

5° Le correspondió a la Rama Judicial, en su calidad de intérprete supremo de la Constitución, precisar las restricciones aplicables al ejercicio de ese poder.

6° Las restricciones eran:

a) El poder de investigación no es ejercible arbitrariamente. Debe perseguir un propósito legislativo.

b) El poder no es utilizable para privar a la ciudadanía de prerrogativas consagradas en la Carta de Derechos.

7° Cuando la investigación se dirige a una agencia o funcionario público los tribunales deben ejercer mayor cautela y mesura al resolver intervenir con el poder de investigación.

8° Los tribunales no constituyen generalmente el foro para ventilar impugnaciones respecto a los motivos de una investigación. La determinación judicial de que se han excedido los límites del poder legislativo de investigación requiere la existencia de una usurpación obvia de funciones pertenecientes a otras ramas.

Éste es el clima en que se redactó la parte correspondiente de la Constitución del Estado Libre Asociado. Al establecerse el poder legislativo en el país, Art. III, Sec. 1 de la Constitución, ésta es la carga jurídica aceptada por tal acto.

Por tratarse precisamente de una constitución, el

cuerpo que vio la luz hace más de treinta años no es un objeto inerte, estático. Es un organismo viviente cuyo objetivo es servir, como toda otra constitución, a la sociedad que rige. Tiene que cambiar, como el río, sin dejar de ser río. Tiene que responder a nuevas realidades, mas por juiciosa conjugación del principio del crecimiento con la necesidad de sostener la estabilidad de la ley y no por el simple arbitrio de los intérpretes del Derecho. Cuando una de nuestras instituciones derive de determinada tradición jurídica, los precedentes de ésta tendrán valor persuasivo en esta jurisdicción, sin olvido de desarrollos valiosos en otros sistemas, aunque sujeto siempre a las realidades específicas de nuestro medio. Veremos luego que la evolución de la jurisprudencia a partir de 1952 no ha afectado sustancialmente los contornos anteriores del poder legislativo de investigación de las agencias y funcionarios públicos.

B. *Las fuentes del derecho parlamentario de investigación en Puerto Rico.*

Las Leyes Foraker y Jones no se expresan directamente sobre el derecho legislativo de información, pero su existencia, derivada de otras disposiciones, era incuestionable. El Art. 30 de la Ley Foraker le reconoció a la Cámara de Delegados "las mismas atribuciones, con respecto a la dirección de sus procedimientos, que usualmente competen a cuerpos legislativos parlamentarios". El Art. 32 de la Ley Jones disponía a su vez:

> El Senado y la Cámara de Representantes . . . tendrán y ejercerán todas las atribuciones, con respecto a la dirección de sus procedimientos, que usualmente corresponden a cuerpos legislativos parlamentarios.

Este Tribunal reconoció la existencia del poder legislativo de investigación entre las "atribuciones" mencionadas antes. En *Banco Popular, Liquidador* v. *Corte*, 63 D.P.R. 66, 79–80 (1944), en que citamos con aprobación a *McGrain*, ante, afirmamos:

Desde tiempo inmemorial, el poder de la rama legislativa del gobierno para practicar investigaciones en apoyo de sus funciones legislativas, nunca ha sido atacado con éxito. "El negarle [a la legislatura] poderes para compenetrarse de los hechos, equivale a exigirle que proporcione el remedio en la oscuridad."

La Comisión de la Rama Legislativa le propuso a la Convención Constituyente una referencia explícita a las comisiones, a tenor con la Proposición Núm. 182 sometida a ese cuerpo. El Art. 6 de la propuesta presentada por la Comisión expresaba que:

El Senado y la Cámara de Representantes . . . tendrán y ejercerán todas las funciones que corresponden a cuerpos legislativos como tales, pudiendo crear comisiones con poderes para citar testigos y requerir la presentación de documentos. 2 *Diario de Sesiones de la Convención Constituyente* 744 (1951).

El señor Padrón Rivera presentó una enmienda a ese texto para que leyese:

"pudiendo crear comisiones con poderes *para investigar y* citar testigos . . .". (Énfasis nuestro.) Pág. 814.

La enmienda fue aprobada. 2 *Diario de Sesiones* 814–815 (1951). El texto fue omitido, no obstante, por la Comisión de Estilo, por entender que la facultad de referencia derivaba de lo que pasaría a ser la Sec. 17 del Art. III. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 152.

A partir de la Constitución del Estado Libre Asociado el poder parlamentario de investigación siguió considerándose, por tanto, como un poder inherente a su propia creación. El Secretario de Justicia opinaba en 1957 que:

. . . el derecho inherente de las Cámaras Legislativas a llevar a cabo investigaciones que puedan servir de base para legislación futura ha sido ampliamente reconocido. Op. Núm. 1957-19, XXVIII *Opiniones del Srio. de Justicia* 70 (1957).

La opinión cita con aprobación a *McGrain* y señala la dura crítica recibida por *Kilbourn*.

■ La facultad y el deber de la Asamblea Legislativa de fiscalizar la ejecución de la política pública y la conducta de los jefes de departamento mediante el ejercicio de sus vastos poderes de investigación han sido reconocidos, después de la Constitución, por este Tribunal. *Hernández Agosto* v. *Romero Barceló*, 112 D.P.R. 407, 428 (1982); *Soto*, supra, pág. 504.

■ En resumen, la fuente del derecho parlamentario de investigación en Puerto Rico no ha sido básicamente alterada por la Constitución del Estado Libre Asociado. Las Secs. 1 y 17 del Art. III representan las fuentes nominales, pero en el fondo persiste el concepto de que la facultad de investigar es parte inseparable de la de legislar. Nada en la Constitución modifica tampoco el entendido contemporáneo de las dimensiones del derecho de investigación de las agencias y funcionarios públicos.

C. *El derecho parlamentario de investigación no es absoluto.*

Como hemos visto, aunque por período considerable se estimó que el derecho legislativo de investigación era irrestricto, desde 1880 comenzó a cambiar la teoría. Hemos resumido las restricciones vigentes para el tiempo en que se formuló la Constitución de Puerto Rico. Fuera de ciertas disposiciones estatutarias, sujetas al escrutinio judicial, sobre la aplicación del método de sopesar intereses y de desarrollos referentes a la doctrina del "privilegio ejecutivo", la jurisprudencia estadounidense mantiene básicamente las fronteras descritas del referido derecho. *Quinn* v. *United States*, 349 U.S. 155 (1955); *Watkins* v. *United States*, 354 U.S. 178 (1957); *Barenblatt* v. *United States*, 360 U.S. 109 (1959); *United States* v. *O'Brien*, 391 U.S. 367 (1968); *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 505–506 (1975). En Puerto Rico, como hemos señalado, nos expresamos en *Soto*, supra, sobre el alcance del

derecho ciudadano de información, mas no nos hemos manifestado todavía sobre el derecho legislativo de información frente a agencias y funcionarios públicos.

D. *El papel de los tribunales en trazar las fronteras del derecho legislativo de investigación.*

La tradición constitucional sostiene el poder de la Rama Judicial para determinar la legalidad de los actos de las Ramas Ejecutiva y Legislativa del Gobierno. A. Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1391, 1408 (1974); *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803); *Baker* v. *Carr*, 369 U.S. 186, 211 (1962); *Powell* v. *McCormack*, 395 U.S. 486, 513–514 (1969); *United States* v. *Nixon*, 418 U.S. 683, 703 (1974). Tal es también la doctrina vigente en Puerto Rico: *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 759–760 (1977).

■ Esto significa que ni los cuerpos y órganos legislativos ni los funcionarios ejecutivos pueden convertirse en jueces de sus propios poderes. *The Federalist*, Núm. 78 (Alexander Hamilton). No le corresponde al Superintendente de la Policía, para aplicar la doctrina a este caso, determinar finalmente qué información es divulgable o no. Los tribunales son los intérpretes finales de las leyes y la Constitución. *Santa Aponte*, supra, pág. 760; *Soto*, supra, pág. 497.

E. *El criterio para precisar los contornos del derecho parlamentario de investigación.*

■ En la parte III, sec. A de esta opinión resumimos los contornos del derecho legislativo de investigación tal como se entendieron para el tiempo en que se formuló la Constitución del Estado Libre Asociado. Se advertirá que, a los fines de determinar si un cuerpo legislativo se ha extralimitado o no en el ejercicio del referido derecho, el criterio empleado por los tribunales era el de inquirir sobre los extremos siguientes: ¿Es arbitrario el uso de ese poder en el caso en cuestión? ¿Se persigue un propósito legislativo?

¿Conlleva la utilización de ese poder la invasión de alguna prerrogativa ciudadana consagrada en la Carta de Derechos?

No se ha citado, ni hemos hallado, decisión alguna anterior a 1952, sea de Estados Unidos o de Puerto Rico, en que se haya empleado el método de sopesar intereses en una situación como la presente. Se trataba el poder de investigación como se trata la cláusula de inmunidad por expresiones parlamentarias y varias otras cláusulas de la Constitución. Respecto a la cláusula de inmunidad, por ejemplo, la tarea judicial se limita a inquirir si el derecho a la libre expresión parlamentaria se ha ejercido dentro de su ancho marco constitucional. La cuestión nunca ha sido la de indagar la naturaleza de la expresión en sí para luego resolver si es permisible a la luz de un interés alegadamente mayor.

Si es que ha de emplearse en el caso de autos el método tradicional, el caso es extremadamente sencillo. La parte recurrida, el Superintendente de la Policía, no ha argumentado ante este Tribunal que la investigación ordenada por el Senado sobre los sucesos acaecidos en el Cerro Maravilla constituya una decisión arbitraria, totalmente desprovista de propósito legislativo. Tampoco se ha planteado que la investigación viole determinada disposición de la Carta de Derechos.

El argumento del señor Superintendente es, en efecto, que debe emplearse en este caso un método distinto al tradicional; que este Tribunal debe resolver qué pesa más en las circunstancias presentes: el poder de investigación del Senado o el reclamo de confidencialidad del señor Superintendente. La posición del recurrido exige examinar el tratamiento reciente del empleo de la técnica de sopesar intereses en este género de casos, la evaluación de la doctrina del privilegio ejecutivo y el análisis de otras interrogantes enumeradas en la parte II de esta opinión.

F. *El método de sopesar intereses.*

El caso de mayor importancia que utiliza el mecanismo del pesaje de intereses, en vez del criterio tradicional, en controversias análogas a la presente es *Nixon,* supra, págs. 706–710, resuelto en forma contraria a la contención del Presidente sobre la superioridad en ese caso del interés en la confidencialidad de las comunicaciones presidenciales.

■ El razonamiento en *Nixon,* aunque no el resultado, ha sido precisamente objeto de duro ataque por acudir al sistema de pesaje de valores. Se ha afirmado, Berger, *Congressional Subpoenas,* supra, pág. 881, que:

> The assumption in *United States* v. *Nixon* that courts should engage in a balancing of competing interests whenever information is sought from the Executive raises still other doubts with respect to congressional demands for information pursuant to its legislative and oversight responsibilities. In the cases of congressional demands for information directed to private citizens, it has been shown that the courts have confined themselves to a refusal to enforce subpoenas or punish for contempt where Congress acted in excess of its jurisdiction or in violation of express constitutional safeguards; *the courts do not attempt to weigh the manner in which Congress exercises its discretion in requesting certain information or subpoenaing certain witnesses against other values, provided Congress is acting within the scope of its jurisdiction. . . . Traditionally, control of discretion lies beyond judicial functions. . . .* (Énfasis nuestro; escolios omitidos.)

Del otro lado, puede aducirse que la utilización del método de equilibrar intereses en conflicto, al menos en ciertos géneros de investigaciones legislativas, tiene sólida base constitucional. Al igual que el poder de investigación es derivable de la facultad de legislar, la obligación de ejecutar las leyes incluye la necesidad de guardar la confidencialidad de determinada información. No podría argumentarse ciertamente que la Rama Legislativa debe tener acceso ilimitado, no importa las circunstancias envueltas, a secre-

tos militares o a información que haría peligrar gravemente la vida de agentes encubiertos.

■ Independientemente de si el método de sopesar valores suplanta o no en la actualidad el método tradicional en toda clase de choque sobre la información que requiera un órgano legislativo de una agencia o funcionario público, el resultado en este caso es idéntico bajo cualquiera de los dos métodos. Ya hemos visto que bajo el método tradicional el Senado tiene derecho a la información solicitada. Examinemos ahora los hechos mediante el análisis de los valores en conflicto.

El resumen que hemos efectuado del desarrollo de la jurisprudencia en este caso revela la amplitud y peso del derecho parlamentario de investigación. La intervención judicial con su uso no ocurre hasta siglos después de su origen. Las limitaciones que luego se le han impuesto son contadas y discretas. Se ha reconocido también que cuando el choque surge entre las Ramas Legislativa y Ejecutiva, a distinción de conflictos entre la Rama Legislativa y ciudadanos particulares, la Rama Judicial debe actuar con especial mesura. Los valores en que se apoye la Rama Ejecutiva para intentar librar del escrutinio público determinadas actuaciones o procedimientos tienen que acarrear considerable peso. No puede olvidarse que, en casos como el presente, no se trata tan solo del ejercicio por la Rama Legislativa de su derecho de obtener información para desempeñar cabalmente sus funciones constitucionales, se trata también de hacer valer uno de los derechos más preciados de la democracia, el derecho de la propia ciudadanía de mantenerse informada, sujeto a las salvaguardas pertinentes. *Soto*, supra, pág. 495.

La información que se solicita, además, no atañe un asunto de escaso interés o significación. Hace más de dos años el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito caracterizó los sucesos del Cerro Maravilla como "one of the most controversial and well-publicized

events in recent Puerto Rico history". *In re San Juan Star Co.*, 662 F.2d 108, 110 (1st Cir. 1981). En días recientes el mismo tribunal se refiere a los mismos sucesos del modo siguiente, al resolver que la Corte de Distrito federal no puede impedir la citación de ciertos testigos para las vistas sobre el Cerro Maravilla en proceso ante el Senado:

> The incident at Cerro Maravilla had and has significant implications and has been the subject of intense media coverage and popular attention. *Colón Berríos* v. *Hernández Agosto*, 716 F.2d 85, 87 (1983).

Contra intereses públicos de tal magnitud y trascendencia, veamos los valores a que apela el señor Superintendente.

Respecto al manual interno sobre el reclutamiento y supervisión de informantes y agentes encubiertos, el señor Superintendente alega que no debe revelarse la identidad de éstos, tal como se desprende de los documentos I(E) y I(F), ni el método o métodos utilizados por la Policía para reclutarlos y supervisarlos. En lo que toca a la primera de estas alegaciones, hemos señalado ya que el cuerpo investigador no está solicitando los documentos I(E) y I(F). No se está requiriendo lista alguna de agentes encubiertos, confidentes o informantes. Con referencia a la segunda alegación, la Resolución del Senado que autoriza la investigación, citada en la parte I de esta opinión, instruye expresamente a la Comisión de lo Jurídico a que estudie "los procedimientos y prácticas generales usadas por el cuerpo de la policía de Puerto Rico en el uso de los agentes encubiertos". ¿Cómo puede llevarse a cabo esta tarea sin el examen del manual de reclutamiento y supervisión, especialmente cuando la parte recurrida no ataca la legitimidad de la encomienda? ¿Sobre qué base en autos puede concluir la Rama Judicial que la Rama Legislativa habrá de usar esa información con menos sentido de responsabilidad que otras ramas del Gobierno con igual jerarquía?

El segundo orden de documentos concierne libros de entradas y salidas de los agentes regulares de la División de Inteligencia en ciertas zonas y para determinadas fechas. El Tribunal Superior reconoce acertadamente que tales libros deben estar sujetos a inspección y así lo ordena, excepto que prohíbe su entrega y publicación. Uno de los problemas de esa prohibición —discutiremos luego otro de gran importancia— es que la contención de la parte recurrente es que estos libros han sido alterados. De nuevo, ¿cómo es que la Comisión puede constatar la veracidad o falsedad de ese aserto sin someter los libros a exámenes periciales? Tampoco se argumentó en esta ocasión por el señor Superintendente que la Comisión excede sus poderes. La resolución habilitadora del Senado le ordena a la Comisión que investigue si ha habido "cualquier intento de cualquier funcionario para encubrir lo ocurrido en el Cerro Maravilla y proteger a los participantes de cualquier acción en su contra". No puede lanzarse una manta de confidencialidad sobre información de posible vitalidad para la contestación a un asunto de tan manifiesto interés público.

El tercer orden de documentos solicita el nombre y fotografía de los agentes *regulares* que integraban la Oficina de Inteligencia en ciertos cuarteles y para ciertos meses del año 1978. La parte recurrida ha resistido revelar esta información por el motivo de que algunos de los agentes regulares a veces han funcionado o funcionan como agentes encubiertos. Respecto a este argumento, su reclamo es distinto al de los agentes encubiertos, confidentes e informantes que operan, conforme los autos, tan solo a base de contratos orales. Estamos seguros, sin embargo, que la Rama Legislativa utilizará la información obtenida con la prudencia que las circunstancias requieran, con debida atención a los requerimientos de la seguridad pública. No puede olvidarse, además, que el reglamento de la Comisión de lo Jurídico contiene diversas salvaguardas para la adecuada protección de los testigos. En primer término, todo

testigo tiene derecho a un aviso no menor de cuarenta y ocho horas *antes* de que se tome su testimonio (Regla 3C). Todo futuro testigo tiene derecho también a exigir que su testimonio se tome en sesión ejecutiva o privada antes de su deposición en público (Regla 6D1). Distinto a la situación cuando emitimos sentencia interlocutoria en este caso, además, la Comisión tiene ahora la facultad de mantener confidencial lo ocurrido en sus sesiones ejecutivas (Regla 7B), lo que permite la adecuada protección de determinados testigos.

En *Colón Berríos*, supra, el Tribunal de Circuito de Boston acaba de resolver lo siguiente respecto a las vistas sobre los sucesos en Cerro Maravilla:

> It seems clear that the holding of these hearings in public and the gathering of the evidence needed fell within the legitimate sphere of legislative activity. The hearings were properly authorized by Puerto Rico Senate Resolution 91 (Feb. 22, 1981), which provides a specific mandate to the Senate Judiciary Committee to inquire into the activities of the police and other agencies of the government leading up to and during the Cerr[o] Maravilla incident as well as the behavior of the executive branch in response to the incident. . . . That the investigation is authorized to probe into alleged wrongdoing in the executive branch of government strengthens, rather than weakens, the claim for legislative immunity. Pág. 90.

Sobre la base de estas conclusiones, Boston resolvió que forzar la comparecencia de ciertos testigos a estas vistas representaba un interés mayor que el derecho a un juicio justo inmediato reclamado por los recurridos. De igual forma resolvemos en este caso que la investigación a fondo en esas vistas de los asuntos enumerados en la Resolución Núm. 91 pesa más que los intereses aducidos por el señor Superintendente.

G. *La doctrina del privilegio ejecutivo.*

La doctrina del privilegio ejecutivo tampoco justifica la negativa del señor Superintendente a suplirle la

información al Senado razonablemente necesaria para desempeñar su labor investigativa o la orden del Tribunal Superior de prohibir la publicación de la prueba que se permite inspeccionar. La Sec. 2 del Art. I, en cuanto adopta la teoría de separación de poderes, y las Secs. 1 y 4, párr. 1, del Art. IV de la Constitución de Puerto Rico proveen base suficiente para la adopción de la doctrina del privilegio ejecutivo en Puerto Rico. La base de la doctrina y aun su razón de ser han sido impugnadas, Berger, *Executive Privilege*, supra, pero las autoridades en contrario gozan de gran valor persuasivo. *Nixon*, supra; L. Tribe, *American Constitutional Law*, Mineola, New York, The Foundation Press, 1978, Sec. 4-14, pág. 202 y ss. y materiales ahí citados.

■ Así como el poder de investigación que posee la Rama Legislativa no es absoluto, tampoco lo es la facultad de la Rama Ejecutiva de retener información sobre la base de su alegada confidencialidad. *Nixon*, supra, pág. 706. Le corresponde también a la Rama Judicial en última instancia precisar las fronteras de ese poder. *Nixon*, supra, págs. 703-705.

A tal fin se ha utilizado generalmente el método de sopesar los intereses en conflicto. *Nixon*, supra, págs. 707-713; *Conway* v. *Rimmer*, [1968] 1 All E.R. 874. Por las razones expresadas en la Sec. F. de esta opinión, el reclamo de privilegio ejecutivo no es suficiente en este caso para impedir la entrega de la documentación solicitada. Cox, *op. cit.*, pág. 1412.

H. *El papel de los estatutos en la definición del privilegio ejecutivo.*

La Rama Ejecutiva no representa dentro de nuestro esquema constitucional el único guardián de la confidencialidad de los secretos de Estado. N. Dorsen y J. Shattuck, *Executive Privilege, the Congress and the Courts*, 35 Ohio St. L.J. 1, 24-25 (1974). De ahí que, para evitar la invocación espuria del privilegio, se acostumbre legislar para indicar su ámbito, sujeto a la determinación final de los tribunales.

Véase, por ejemplo, la Ley federal sobre Libertad de Información (1958), 5 U.S.C. sec. 552, especialmente el inciso 4(c); la Ley federal sobre la Protección de la Seguridad Nacional (1982), 50 U.S.C. sec. 421; S. Barber, *The California Public Records Act: The Public's Right of Access to Governmental Information*, 7 Pac. L.J. 105 (1976). Este tipo de legislación es de esencial importancia, ya que ayuda a evitar la sustracción del escrutinio público de información a que tenga derecho la ciudadanía en buena democracia. Es así como en Estados Unidos se ha resuelto específicamente bajo la Ley de Libertad de Información que los ciudadanos tienen derecho de obtener documentos que revelen los métodos de supervisión, por parte del F.B.I., de agentes encubiertos. *Playboy Enterprises* v. *U.S. Dept. of Justice*, 516 F.Supp. 233, 243 (1981), modificado sobre otros aspectos y confirmado en 677 F.2d 931 (1982). Se ha indicado, además, que aun los nombres de agentes del F.B.I. deben ser revelados cuando la legalidad de su conducta está en controversia. *Baez* v. *United States Dept. of Justice*, 647 F.2d 1328, 1339 (1980).

██ Resolvemos que una alegación desnuda de privilegio público, sin apoyo en legislación adecuada, debe escudriñarse con particular recelo. La ausencia de tal apoyo debilita aún más el reclamo de confidencialidad del señor Superintendente en este caso. *Soto*, supra, págs. 494–495.

I. *El problema de la censura previa. Otros aspectos de la orden de instancia.*

Por último, la orden del Tribunal Superior, en cuanto prohíbe que se dé a la publicidad la información cuya inspección se permite, presenta un problema de censura previa. Como se expresó en *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963):

Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.

600

Véanse: *Near* v. *Minnesota*, 283 U.S. 697 (1931); *Organization for a Better Austin* v. *Keefe*, 402 U.S. 415, 419 (1971); Tribe, *op. cit.*, Sec. 12-31, pág. 724 y ss. Una orden análoga a la de autos fue declarada nula en el caso en que se quiso impedir la publicación de los célebres "documentos del Pentágono". *New York Times Co.* v. *United States*, 403 U.S. 713 (1971).

■ El análisis de intereses efectuado en esta opinión revela que, en la situación de autos, no se ha rebatido eficazmente la presunción de invalidez constitucional· de la orden emitida para prohibir previamente la publicación de la información solicitada. Como hemos indicado antes, presumimos que la Rama Legislativa utilizará la información que obtenga en forma que no comprometa innecesariamente la seguridad comunal o la de los agentes del orden público.

■ Es igualmente nula la parte de la orden en que se especifica que tan solo un senador de la mayoría y otro de la minoría han de tener acceso a la información. Una vez establecido por este Tribunal el derecho de la Comisión de lo Jurídico a la documentación requerida, la doctrina de separación de poderes impide que la Rama Judicial le dicte a la Rama Legislativa pautas internas sobre a quiénes debe designar esa rama para ejercer tal derecho. *Santa Aponte*, supra, pág. 764.

IV

Conclusión

Por las consideraciones que anteceden, *se revocará la resolución recurrida. El señor Superintendente de la Policía hará entrega a la Hon. Comisión de lo Jurídico del Senado de todos los documentos solicitados, a excepción del grupo I(E) y el I(F). La Comisión determinará internamente quiénes tendrán acceso a la información y adoptará las medidas cautelares pertinentes.*

El Juez Asociado Señor Dávila no intervino. El Juez Asociado Señor Negrón García concurre en el resultado sin opinión.