Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| NATIONAL PUBLIC FINANCE<br><br>Apelante<br><br>v.<br><br>NEGOCIADO DE ENERGÍA DE PUERTO RICO<br><br>Apelado | TA2026AP00069 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil núm.: SJ2025CV09252<br><br>Sobre: Recurso Especial de Revisión Judicial para el Acceso a Información Pública (Ley núm. 141-2019, según enmendada) |

Panel integrado por su presidente el juez Hernández Sánchez, el juez Rivera Torres y el juez Marrero Guerrero.

**Rivera Torres, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de febrero de 2026.

Comparece ante este tribunal apelativo, National Public Finance (National o parte apelante) mediante el recurso de apelación[1] de epígrafe solicitándonos que revisemos la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 19 de diciembre de 2026, notificada el mismo día. Mediante este dictamen, el foro primario resolvió *No Ha Lugar* a el *Recurso Especial de Revisión Judicial para el Acceso a Información Pública* instada por el apelante.

Por los fundamentos que expondremos a continuación, confirmamos la *Resolución* apelada.

---

[1] Mediante la *Resolución* de 21 de enero de 2026 ordenamos acoger el recurso de epígrafe como uno de *certiorari*. El 30 de enero de 2026, a petición de la parte apelante, se dejó sin efecto el cambio de materia y se mantuvo el recurso como uno de apelación.

**I.**

El presente caso tiene su génesis en una solicitud presentada por el apelante, mediante correo electrónico el 4 de septiembre de 2025, ante el Negociado de Energía de Puerto Rico (Negociado o el apelado).[2] En la misma peticionó copia del *Investigation Report* que se emitió en el caso *In re: Puerto Rico's Electric System Cash Flow and Cash Position Concerns*, NEPR-In-2024-0004. Según surge de la reclamación, el 30 de octubre de 2024, el Negociado inició una investigación relacionada con una supuesta crisis de liquidez en el sistema eléctrico.[3] Para llevar a cabo esta investigación se designó, como Oficial Examinador, al Lcdo. Scott Hempling (Oficial Examinador o licenciado Hempling). Este posteriormente solicitó que, para facilitar los procedimientos, la investigación fuera dividida en dos fases. Dichas fases, según el licenciado Hempling, a pesar de tener propósitos diferentes guardan relación una con la otra. Igualmente, el Oficial Examinador indicó que una vez culminada la Fase 1 de la investigación, habría respondido las interrogantes y rendiría un informe para posteriormente comenzar la segunda fase.

Así las cosas, National advino en conocimiento, durante una vista celebrada el 28 de febrero de 2025, que el Oficial Examinador culminó la primera fase de la investigación y rindió el informe.[4] Además, se enteró que dicho informe se notificó a entidades como LUMA, Genera PR, LLC y la Autoridad de Energía Eléctrica de Puerto Rico (AEE), por lo que procedió a presentar la solicitud de copia del referido informe.

---

[2] Véase, el Sistema Unificado de Manejo y Administración de Casos del TPI (SUMAC TPI, Entrada núm. 1).

[3] Nótese que originalmente esta investigación fue ordenada por el Negociado en el caso *In re: Puerto Rico Electric Power Authority's Permanent Rate*, NEPR-MI-2020-0001. Posteriormente y por recomendación del Oficial Examinador fue separada del citado caso y se creó el nuevo expediente bajo el alfanumérico *In re: Puerto Rico's Electric System Cash Flow & Cash Position Concerns*, NEPR IN-2024-0004.

[4] La parte apelante, forma parte de otro procedimiento administrativo dentro del Negociado, mediante el cual obtuvo la información de que el informe del Oficial Examinador había sido presentado y notificado a LUMA, Genera PR, LLC, y la Autoridad de Energía Eléctrica en o alrededor del 18 de febrero de 2025.

En respuesta, el 18 de septiembre de 2025, el Negociado le notificó a National que el informe solicitado formaba parte de una investigación en proceso, por lo que el mismo no es público. A su vez le indicaron que, una vez culminara la investigación, el informe estaría disponible para inspección y distribución pública. Por lo cual su solicitud, había sido denegada en ese momento.

Inconforme con la respuesta por parte del Negociado, el 14 de octubre de 2025, National presentó ante el TPI una demanda intitulada *Recurso Especial de Revisión Judicial para el Acceso a Información Pública*, al amparo de la Ley núm. 141-2019, conocida como la *Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública* (Ley de Transparencia). Mediante esta, National sostuvo que el informe solicitado al Negociado se trataba de uno de naturaleza final. Esto, debido a que el informe solicitado no puede ser considerado un informe parcial al cumplirse la condición de ser necesario para iniciar la segunda etapa.

Asimismo, se arguyó que una vez el informe parcial se notificó a la parte investigada, la investigación y su informe son finales. Por lo cual, al haberse notificado el informe a entidades investigadas como LUMA, Genera PR, LLC, entre otras, implica que se tiene que dar por concluida la primera fase de la investigación. En consecuencia, el informe es final, y su contenido debe estar disponible al público, pues se trata de información pública, no confidencial.

Trascurridos varios incidentes procesales, el 29 de octubre siguiente, el apelado presentó el escrito de contestación a la demanda intitulado *Oposición del Negociado de Energía a: Recurso Especial de Revisión Judicial para el Acceso a Información Pública.*[5] En síntesis, el apelado arguyó que lo solicitado por National no era

---

[5] SUMAC TPI, Entrada núm. 9.

información pública, pues forma parte de una investigación en proceso relacionada con problemas de liquidez de la AEE y de LUMA. Igualmente, planteó que la investigación de la cual surge el pedido se dividió en dos fases, por lo que no son investigaciones distintas. Sobre esto especificó que el Oficial Examinador designado determinó bifurcar los procedimientos para recopilar y evaluar la información para luego presentarle los hallazgos al Negociado.

Asimismo, señaló que, mediante la Resolución y Orden del 19 de febrero de 2025, se determinó que el Oficial Examinador había completado lo que este denominó la primera fase de su investigación y emitió un informe al respecto. Por ello, es un informe parcial con hallazgos preliminares de la primera fase de la investigación, no uno final con la totalidad de sus hallazgos y determinaciones para la evaluación que se le encomendó.

Por tanto, el Negociado sostuvo que el factor determinante para clasificar la información como pública es que la investigación concluya y se emita un informe final, según dispuesto en el Reglamento Núm. 8543 del 18 de diciembre de 2014, *Reglamento de Procedimientos Adjudicativos Avisos de Incumplimiento, Revisión de Tarifas e Investigaciones* de la Comisión de Energía de Puerto Rico (Reglamento Núm. 8543). En consecuencia, el informe parcial forma parte de una investigación activa y el hecho de que se notificara el mismo a los investigados para que ésos reaccionen a los hallazgos preliminares no concluye la misma.

Luego de varios incidentes procesales, que incluyeron la celebración de una vista argumentativa, el 7 de noviembre de 2025, el TPI evaluó los argumentos de las partes. Así las cosas, el 19 de diciembre siguiente, el TPI notificó la *Resolución* recurrida en la cual

declaró *No Ha Lugar* a la solicitud de acceso a información. El foro

*a quo* razonó:[6]

> (...)

> Analizada la controversia, debemos concurrir con los argumentos del NEPR en cuanto a la confidencialidad del informe solicitado, toda vez que se trata de una investigación en curso. La investigación llevada a cabo se trata sobre los problemas de liquidez de la Autoridad de Energía Eléctrica; así como de sus operadores Genera y Luma. Esta investigación se lleva a cabo a instancias del NEPR, bajo sus facultades y deberes conferidos mediante la Ley de Transformación y Alivio Energético de Puerto Rico, Ley Núm. 57-2014 ("Ley 57-2014") y la Ley de Política Pública Energética de Puerto Rico, Ley Núm. 17-2019 ("Ley 17- 2019"). **Resulta pertinente aclarar que la investigación en curso no se limita a los hallazgos vertidos en el primer informe**. **El mero hecho de que el investigador haya bifurcado el proceso investigativo en dos (2) fases, para facilitar, agilizar el manejo procesal de la prueba, no significa que se trata de dos investigaciones separadas e independientes entre sí**. Como cuestión de hecho, la notificación del informe a las partes concernidas no lo convierte automáticamente en un documento público, sobre todo cuando se desprende que, a través de todo el proceso investigativo, el asunto se considera confidencial.

> [...]

> **Nos parece claro que el Informe solicitado por el Recurrente, al estar viva la investigación, es un documento confidencial**. La sección anteriormente citada no puede ser más elocuente. Luego de analizar el procedimiento investigativo llevado a cabo por el NEPR; así como, el Oficial Investigador debemos concluir que, no solo el Informe solicitado, si no el expediente y los documentos relacionados a la investigación, son parte de una investigación que en estos momentos se encuentra en curso. Dicho expediente y todo su contenido está protegido, no solo por la jurisprudencia interpretativa y el estado de derecho previamente citado, sino por la protección que contiene la investigación en curso bajo las leyes anteriormente citadas. Existe un interés extremadamente apremiante de, no solo, proteger la investigación en curso, sino de proteger a los testigos y toda la prueba que se pudo haber discutido en el expediente investigativo para establecer su entendimiento de que procederá eventualmente una vez concluya el proceso. [Énfasis nuestro)

Inconforme con el dictamen, el apelante acude ante esta *Curia*

imputándole al foro de primera instancia haber incurrido en el

siguiente error:

> ERRÓ EL TPI AL CONCLUIR QUE EL INFORME SOLICITADO POR NATIONAL ES UN

---

[6] SUMAC TPI, Entrada núm. 20, a las págs. 6 y 7.

DOCUMENTO CONFIDENCIAL POR FORMAR PARTE DE UNA INVESTIGACIÓN EN CURSO Y –A CONSECUENCIA DE ELLO– DENEGAR SU ACCESO.

El 30 de enero de 2026, emitimos una *Resolución* concediéndole a la parte apelada hasta el 22 de febrero de 2026 para expresarse. Luego de una prórroga solicitada y concedida, el 25 de febrero de 2026, la parte apelada presentó su *Alegato en Oposición a Revisión Judicial*, por lo que nos damos por cumplidos y a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes y el expediente apelativo, así como estudiado el derecho aplicable, procedemos a resolver.

## II.

**El derecho constitucional de acceso a información pública**

En el preámbulo de la decisión de nuestro Tribunal Supremo en *Kilómetro 0, Inc. v. Pesquera López*, 207 DPR 200 (2021), el Hon. Juez Asociado Estrella Martínez indicó y citamos:

> Desde <u>Soto v. Secretario de Justicia</u>, infra, este Tribunal ha destacado la importancia de que la ciudadanía tenga acceso a aquella información pública que obra en manos del Gobierno, **no sólo como corolario del ejercicio de un derecho fundamental, sino también como una parte vital de la fiscalización de la función pública**. Sin embargo, también hemos reconocido que **tal derecho no es absoluto, pues el Estado puede imponer restricciones al acceso a la información en servicio de un interés público superior**.
>
> En esta ocasión, nos corresponde **examinar una restricción a tal derecho por la vía de un reclamo de confidencialidad por parte del Estado**. En específico, debemos determinar si ciertos informes relacionados a la política pública promovida por la Reforma de la Policía son susceptibles a la revisión pública o si, por el contrario, **el Estado tiene un interés apremiante en no divulgar tal documentación**. [Énfasis nuestro]

En el referido dictamen el más alto foro reitera la jurisprudencia aplicable a esta controversia y por su pertinencia citamos *inextenso*:

> Como pilar de toda sociedad democrática, los ciudadanos y ciudadanas de Puerto Rico poseen un derecho fundamental al acceso a la información

pública, el cual está estrechamente vinculado con los derechos a la libertad de palabra, prensa y asociación. Art. II, Sec. 4, Const. ELA, LPRA, Tomo 1; Trans Ad de P.R. v. Junta de Subastas, 174 DPR 56, 67 (2008); Ortiz v. Dir. Adm. de los Tribunales, 152 DPR 161 (2000); Soto v. Srio. de Justicia, 112 DPR 477, 485-486 (1982). Este derecho garantiza que toda persona pueda examinar el contenido de los expedientes, **informes** y documentos **que hayan sido recopilados por el Estado durante sus gestiones gubernamentales**. Ortiz v. Dir. Adm. de los Tribunales, supra. Este mandato constitucional también ha sido avalado en nuestro ordenamiento por la vía estatutaria, la cual reconoce que "[t]odo ciudadano tiene derecho a inspeccionar y sacar copia de cualquier documento público de Puerto Rico, salvo lo expresamente dispuesto en contrario por la ley". Art. 409 del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA sec. 1781.

El derecho al acceso a la información pública se ancla en la idea de que todas las personas están legitimadas a saber y a conocer de los asuntos gubernamentales. E. Rivera Ramos, La libertad de información: Necesidad de su reglamentación en Puerto Rico, 44 Rev. Jur. UPR 67, 67-68 (1975). Esto, pues, en una sociedad democrática, "resulta imperativo reconocer al ciudadano común el derecho legal de examinar e investigar cómo se conducen sus asuntos". Ortiz v. Dir. Adm. de los Tribunales, supra (citando a Soto v. Srio de Justicia, supra, pág. 485). Su importancia está enraizada en la noción de que el conocimiento de las gestiones públicas facilita la libre discusión de los asuntos gubernamentales y, por ende, el ejercicio pleno de la libre expresión. Colón Cabrera v. Caribbean Petroleum, 170 DPR 582, 590 (2007).

Asimismo, *tal conocimiento permite evaluar y fiscalizar la función pública de forma más adecuada, como también cataliza una participación ciudadana más efectiva* e inteligente en los procesos gubernamentales. Esto, a su vez, *promueve la* transparencia en la función gubernamental, estimulando, así, la sana administración pública. Bhatia Gautier v. Gobernador, 199 DPR 59, 80–81 (2017). Dicho de otro modo, como herramienta fiscalizadora, el derecho al acceso a la información faculta a las personas a emitir juicios informados sobre los actos de su gobierno. Colón Cabrera v. Caribbean Petroleum, supra. Como se sabe, nuestros principios democráticos "garantizan el derecho del pueblo a pasar un juicio fiscalizador sobre todas las acciones y determinaciones del Gobierno". Trans Ad de P.R. v. Junta de Subastas, supra, pág. 67. De lo contrario, "[p]ermitir que el gobierno maneje los asuntos públicos bajo el manto de la secretividad es invitar a la arbitrariedad, la mala administración, la indiferencia gubernamental, la irresponsabilidad pública y la corrupción". Rivera Ramos, op. cit., pág. 69. Por lo cual, "[h]oy día la secretividad en los asuntos públicos es excepción y no norma". Santiago v. Bobb y El Mundo, Inc., 117 DPR 153, 159 (1986).

**Ahora bien, el derecho al acceso a la información requiere, como precursor, que la información que se solicita sea, en efecto, de naturaleza pública**. Bhatia

Gautier v. Gobernador, supra, pág. 81. A esos fines, el Artículo 1(b) de la Ley de Administración de Documentos Públicos de Puerto Rico, Ley Núm. 5 de 8 de diciembre de 1955, según enmendada, 3 LPRA sec. 1001, define documento público como:

[T]odo documento que se origine, conserve o reciba en cualquier dependencia del Estado Libre Asociado de Puerto Rico de acuerdo con la ley o en relación con el manejo de los asuntos públicos y que de conformidad con lo dispuesto en la sec. 1002 de este título se haga conservar que se requiera conservar permanentemente o temporalmente como prueba de las transacciones o por su valor legal. Incluye aquellos producidos de forma electrónica que cumplan con los requisitos establecidos por las leyes y reglamentos.

Es decir, "un documento público es el que un organismo estatal recibe en el curso de sus procedimientos y que está obligado a preservar." Trans Ad de P.R. v. Junta de Subastas, supra, pág. 69. Así, "[u]na vez un documento cae bajo alguna de estas definiciones, el ciudadano común tiene derecho a solicitar acceso a la información y, como veremos, el Estado sólo podrá negar válidamente el acceso a un ciudadano interesado en un número determinado de supuestos." Ortiz v. Dir. Adm. De Los Tribunales, supra, pág. 176. *Entiéndase, una vez el documento es catalogado como público, todo ciudadano y ciudadana tiene legitimación activa para solicitar y acceder a tal información.* Colón Cabrera v. Caribbean Petroleum, supra, pág. 589. Esto, pues "[e]n la medida en que todo ciudadano tiene el derecho a inspeccionar cualquier documento público, el acto de denegar el acceso, por sí mismo, causa al solicitante un daño claro, palpable y real". Ortiz v. Dir. Adm. de los Tribunales, supra, pág. 177. En fin, este derecho requiere que el Estado divulgue toda información pública con el fin de "expeditar el camino de los ciudadanos interesados -- inclusive críticos y adversarios-- en averiguar la verdad y no sembrar el camino de obstáculos". Soto v. Srio de Justicia, supra, pág. 504.

No obstante, en ocasiones previas hemos reconocido circunstancias particulares en las que el Estado puede reclamar que se preserve la confidencialidad de cierta información pública. *Para que un reclamo de confidencialidad triunfe, el Estado debe probar de forma precisa e inequívoca la aplicabilidad de alguna de las siguientes excepciones: (1) que una ley así lo declara; (2) que la comunicación está protegida por algún privilegio evidenciario; (3) que la divulgación de la información puede lesionar derechos fundamentales de terceros; (4) que se trate de un confidente,* según la Regla 515 de Evidencia de 2009, 32 LPRA Ap. VI, o (5) que sea información oficial conforme a la Regla 514 de Evidencia de 2009, 32 LPRA Ap. VI. Santiago v. Bobb y El Mundo, Inc., supra.

Sin embargo, *aquellas restricciones que el Estado impone en el acceso a la información deben satisfacer los criterios de un escrutinio estricto.* Véase, Bhatia Gautier v. Gobernador, supra, pág. 82; Ortiz v. Dir. Adm. de los Tribunales, supra, pág. 178; Colón Cabrera

v. Caribbean Petroleum, supra, pág. 593. Es decir, al momento de invocar alguna de las excepciones precitadas, el Estado no puede negar el acceso a la información pública de forma caprichosa o arbitraria. Colón Cabrera v. Caribbean Petroleum, supra, pág. 590. Cuando el Estado reclama la confidencialidad de algún documento público, éste "tiene la carga de probar que satisface cualquiera de las excepciones antes enumeradas". Íd., pág. 591. Por consiguiente, la negación por parte del Estado a la divulgación de información pública debe estar fundamentada y justificada, pues "[n]o bastan meras generalizaciones". Santiago v. Bobb y El Mundo, Inc., supra.

Por tal razón, *los tribunales debemos ser "cautelosos en conceder livianamente cualquier pedido de confidencialidad del Estado". Santiago v. Bobb y El Mundo, Inc., supra. Así, "[a]nte la hermética resistencia del Estado a viabilizar el derecho de acceso a la información, corresponde a los tribunales franquear el camino".* Soto v. Srio de Justicia, supra, pág. 504. De lo contrario, se avalaría el retroceder en los avances a favor del derecho al acceso a la información gubernamental y a la igualdad entre el Estado y los ciudadanos. Eng'g Servs. Int'l, Inc. v. Autoridad de Energía Eléctrica de Puerto Rico, 2020 TSPR 103 (citando a Santiago v. Bobb y El Mundo, Inc., supra, pág. 160.)" [Énfasis en el original y nuestro e itálicas nuestras]. *Kilómetro 0, Inc. v. Pesquera López, supra*, págs. 7-12.

Conforme surge de la legislación y jurisprudencia previamente citadas, **el derecho de acceso a la información pública no es absoluto**. Existen situaciones en que este derecho debe ceder en atención a otros imperativos de interés público. *Colón Cabrera v. Caribbean Petroleum*, supra, a la pág. 591; *Nieves v. Junta*, supra, a la pág. 103. Es decir, "[n]o hay un derecho general de inspección de documentos que, aunque de naturaleza pública, tengan que ser mantenidos en secreto y fuera de la inspección ordinaria." *Soto v. Srio. de Justicia*, 112 DPR 477, 494 (1982).

Ahora, **el peso corresponde al Estado para justificar cualquier reclamo de confidencialidad**. *E.L.A. v. Casta Developers*, 162 DPR 1, 11 (2004). Cuando el Estado invoca una disposición legal como fundamento para negar el acceso a información pública, **el estatuto debe superar el escrutinio judicial estricto**, como sigue: (1) caer dentro del poder constitucional del Gobierno; (2) propulsar un interés gubernamental apremiante; (3) que tal interés

no esté relacionado con la supresión de la libertad de expresión, y (4) que la restricción incidental a la libertad de expresión no sea mayor que la esencial para propulsar dicho interés apremiante. *Soto v. Srio. de Justicia*, supra, a las págs. 493-494. **Una norma de confidencialidad absoluta no podrá superar el escrutinio constitucional estricto**. *Nieves v. Junta,* supra, a la pág. 104. El tribunal deberá hacer un **balance de intereses** a base de un análisis de la totalidad de las circunstancias para determinar si el reclamo del Estado responde a la existencia de intereses apremiantes de mayor jerarquía que los valores protegidos por el derecho ciudadano a la información. *Angueira v. J.L.B.P. I*, 150 DPR 10, 27 (2000); *Noriega v. Gobernador*, 130 DPR 919, 938 (1992). Ese balance se realizará de forma estricta a favor del reclamante de la solicitud y en contra del privilegio gubernamental. *López Vives v. Policía de P.R.*, 118 DPR 219, 233 (1987).

**Ley núm. 141-2019**

La Ley núm. 141-2019 conocida como la *Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública* fue aprobada el 1 de agosto de 2019 "... a los fines de establecer una política pública de acceso a la información pública; ordenar, organizar y pautar mecanismos procesales sencillos, ágiles y económicos de acceso real a los documentos e información pública; consignar principios e instrumentos de garantía al acceso; ordenar la designación de Oficiales de Información en cada entidad gubernamental; y para otros fines relacionados".[7] Dicha pieza legislativa impone expresamente una interpretación "**en la forma más liberal y beneficiosa para la persona solicitante de información pública**". (Énfasis nuestro), 3 LPRA sec. 9922.

---

[7] Véase, preámbulo de la Ley núm. 141-2019.

El Artículo 3 de la Ley núm. 141-2019, 3 LPRA sec. 9913, dispone la política pública del Gobierno de Puerto Rico reafirmando los principios antes enunciados de la siguiente manera:

> **(1) La información y documentación que produce el gobierno se presume pública y accesible a todas las personas por igual**.
> (2) La información y documentación que produce el gobierno en sus estudios, transacciones y en el ejercicio de la autoridad pública, de manera directa o delegada, son patrimonio y memoria del pueblo de Puerto Rico.
>
> (3) **El derecho constitucional de acceso a la información requiere la transparencia gubernamental**.
>
> (4) Toda información o documento que se origine, conserve o reciba en cualquier dependencia del Gobierno, aunque se encuentre bajo la custodia de un tercero, **se presume público y debe estar accesible al Pueblo y la prensa**.
>
> (5) **El derecho de acceso a la información pública es un pilar constitucional y un derecho humano fundamental**.
>
> (6) El acceso a la documentación e información pública tiene que ser ágil, económico y expedito.
>
> (7) Toda persona tiene derecho a obtener la información y documentación pública, sujeto a las normas y excepciones aplicables.
>
> [...]

Por su parte, el Artículo 7 Ley núm. 141-2019, 3 LPRA sec. 9917, establece que "[t]oda decisión de denegar la divulgación de información pública tiene que especificar por escrito **los fundamentos jurídicos en los que se basa la denegatoria o negativa** de entregarla en el término establecido". [Énfasis nuestro]

De igual modo, dicho precepto impone un término de diez (10) días para que la entidad gubernamental produzca "cualquier información pública para su inspección, reproducción o ambos, a petición de cualquier solicitante". [8] *Íd.* Asimismo, si bien la Ley núm. 141-2019, *supra*, establece que la información pública se entregará

---

[8] Aclaramos que lo esbozado versa sobre la ley aplicable al momento de la solicitud de información. En la actualidad la Ley 141-2019 fue enmendada por la Ley núm. 156 de 13 de diciembre de 2025. En virtud de lo cual, el término para que la entidad gubernamental produzca "cualquier información pública para su inspección, reproducción o ambos, a petición de cualquier solicitante" aumentó a veinte (20) días.

en el formato solicitado por el requirente, no descarta el cobro de derechos y cargos razonables en ese proceso; toda vez que la entrega no supone "un costo mayor que la entrega en papel o en el formato que usualmente utiliza la entidad gubernamental". Además, "[s]i la entrega de la información requerida implica un gasto extraordinario, la entidad gubernamental divulgará la misma en el formato disponible o de menor costo" y "establecerá la forma de acreditar la entrega efectiva de la información solicitada". 3 LPRA sec. 9918.

De otra parte, la Ley núm. 141-2019, cumple con propósitos similares a la ley federal conocida como *Freedom of Information Act* (FOIA), 5 USCA sec. 552 *et seq.*, cuya jurisprudencia es altamente persuasiva. En ese sentido, ni el FOIA ni la Ley núm. 141-2019 obligan al Gobierno a crear documentos a la medida, que respondan a una petición en particular ni a brindar información abstracta, sino a **los documentos que físicamente obran en las agencias**. Véanse, *US Department of Justice v Tax Analysts*, 492 US 136 (1989), *Forsham v. Harris,* 445 US 169 (1980), y *Kissinger v. Reporters Committee for Freedom of Press,* 445 US 136 (1980).[9]

**Reglamento de Procedimientos Adjudicativos, Avisos de Incumplimiento, Revisión de Tarifas e Investigaciones**

El *Reglamento de Procedimientos Adjudicativos, Avisos de Incumplimiento, Revisión de Tarifas e Investigaciones, Reglamento* Núm. 8543, se adoptó al amparo de los Artículos 6.3, 6.4, 6.24 y 6.25 de la Ley núm. 57, *supra*, secs. 1054b, 1054c, 1054w y 1054x. Este **aplica a todos los procedimientos adjudicativos, a los procedimientos de avisos de incumplimiento y a las investigaciones que se ventilen ante o por el NEPR.** El Reglamento tiene, como parte de sus propósitos, establecer las

---

[9] "[...] [T]he FOIA applies to records which have been *in fact* obtained, and not to records which merely *could have been* obtained. [...] The legislative history of the FOIA abounds with ... references to records *acquired* by an agency". [...] [T]he requirement that the materials be in the agency's control at the time the request is made [...] the FOIA does not cover "information in the abstract" [...]". *US Department of Justice v Tax Analysts*, supra, a las págs. 144-146.

normas que regirán los procedimientos de investigación del Negociado. Véase, Sección 1.03 del Reglamento Núm. 8543. En lo pertinente a los procesos de investigación y los informes producto de esta, la Sección 15.07 del citado Reglamento dispone lo siguiente:

> **Al finalizar una investigación, la Comisión, por sí o por la persona que ésta haya designado, preparará un informe detallado sobre la investigación realizada**. El informe advertirá que la persona investigada tiene derecho a contestar u objetar el mismo, y especificará los términos de tiempo correspondientes.
>
> No obstante, cuando se trate de casos de estudios estadísticos, legislación, reglamentación e investigaciones incidentales o de menor importancia, que no conlleven o impliquen un resultado adverso, la Comisión no tendrá que preparar informe escrito alguno.
>
> **En aquellos casos en que la Comisión prepare un informe de la investigación, copia de éste será notificado a la persona investigada.** (Énfasis nuestro).

Asimismo, **describe que los expedientes son confidenciales mientras las investigaciones están en curso y a partir de qué momento es que dejan de serlo y en consecuencia es público su contenido**. En específico, la Sección 15.10 del Reglamento Núm. 8543 establece que:

> **El expediente de la Comisión será de naturaleza confidencial mientras la investigación se encuentre en proceso.**
>
> **El expediente estará disponible al público en general una vez el informe de la investigación sea notificado a la parte investigada <u>o</u> una vez concluya la investigación que, según las disposiciones de la Sección 15.07 de este Capítulo, no requiera que la Comisión prepare un informe**. No obstante, se protegerá cualquier información que durante el transcurso de la investigación haya sido clasificada como privilegiada, así como cualquier información que pueda lesionar derechos fundamentales de terceros o el derecho a la intimidad de la persona investigada. (Énfasis y subrayado nuestro).[10]

**III.**

---

[10] El uso de la conjunción disyuntiva "o", distinto al de la conjunción "y", tiene el efecto de desvincular las palabras entre las que es usada. *Cooperativa v. Hernández Hernández*, 205 DPR 624, 636 n.14 (2020); *Alejandro Rivera v. ELA*, 140 DPR 538, 544 (1996); *Mari Bras v. Alcaide*, 100 DPR 506 (1972); *Pueblo v. Mantilla*, 71 DPR 36 (1950).

En su único señalamiento de error, la parte apelante señaló que erró el TPI en su apreciación de que el factor decisivo para determinar el carácter público de un informe es la culminación de la investigación y no la entrega de este a las partes investigadas. Adelantamos que no le asiste la razón.

El apelante sostiene que tiene derecho a obtener el informe solicitado al Negociado, al amparo de la Ley 141-2019, *supra*. Arguye que el informe es información pública, puesto que el mismo fue notificado a las partes investigadas. Asimismo, manifiesta que el propio Reglamento Núm. 8543 avala tal acción, pues, expresan que de una lectura de la Sección 15.10 se dispone clara y expresamente que el expediente estará disponible al público en general una vez el informe se notifique a la parte investigada.

De entrada, es preciso señalar que la Sección 15.10 del Reglamento Núm. 8543 **establece dos situaciones bajo las cuales un expediente deja de ser de naturaleza confidencial y por tanto su contenido es público**. La primera surge una vez el informe de la investigación sea notificado a la parte investigada. Sin embargo, también dispone una segunda situación "**o una vez concluya la investigación**". Por lo que, en el caso de surgir cualesquiera de las circunstancias especificadas en la norma, la información continuará como confidencial.

En lo pertinente al caso de autos, es importante subrayar que resulta ser un hecho incuestionable, que el Oficial Examinador determinó bifurcar el proceso investigativo. Por lo cual, este llevaría a cabo **una investigación dividida en dos fases**, las cuales a pesar de cumplir con propósitos específicos se relacionan entre sí para culminar la misma. Incluso, National en su escrito ante nuestra

consideración, expone que la segunda fase depende de la información obtenida durante la primera etapa de la investigación.[11]

Ahora bien, y como correctamente razonó el TPI en la *Resolución* apelada, el simple hecho de que un proceso investigativo sea bifurcado, en dos fases, para un mejor manejo, no implica que se trate de dos investigaciones separadas e independientes entre sí. De igual manera, resulta pertinente y necesario reafirmar que el haberse notificado un informe preliminar a las partes, por sí solo no conlleva que el documento sea automáticamente uno público. Esto, máxime cuando el Oficial Examinador remitió el informe parcial de la primera fase a las corporaciones investigadas, como parte de la metodología adoptada de investigación, para recopilar información de la reacción del investigado sobre los hallazgos preliminares. Apuntalamos que en la propia demanda, National incluyó documento intitulado *Order Confirming Investigative Procedures, Clarifying Scope, Issuing Supplemental Questions to Chief Financial Officers, and Setting Submission Deadlines* suscrito por el Oficial Examinador y dirigido al Negociado el 19 de noviembre de 2024, en el cual se indica el alcance de cada fase investigativa más incluye un diagrama descriptivo.[12] Por tanto, la propia parte apelante conoce que la investigación se dividiría en dos etapas.

---

[11] Véase, *Apelación Civil*, a la pág. 15.
[12] SUMAC TPI, Entrada núm. 1, Anejo 4, a la pág. 9:

Más aún, de una sencilla lectura de ese gráfico notamos que la segunda fase depende del resultado de la información recopilada y analizada en la primera fase, referente a, si existe o no una emergencia y la manera de afrontarla o resolverla con inmediatez.

A base de lo antedicho, entendemos que la investigación no ha concluido, pues cuando se finalice la segunda fase de investigación, es que la misma ha terminado. Por consiguiente, en esta etapa investigativa, los hallazgos aún permanecen confidenciales. Así pues, y acorde con lo preceptuado en la Sección 15.10 del Reglamento Núm. 8543, el expediente será de naturaleza confidencial mientras la investigación se encuentre en proceso. Al respecto, en *Kilómetro 0, Inc. v. Pesquera López, supra*, a la pág. 218, nuestro alto foro razonó que "la protección de investigaciones en curso constituye un interés gubernamental apremiante", asimismo "el descargue adecuado de la función de seguridad pública requiere que el Estado tenga a su disposición un aparato investigativo capaz".

---

**Appendix B: Investigation Scope Diagram**

**Organization of the Cash-Flow Inquiry**

| **Phase One** | **Phase Two** |
|---|---|
|  | Phase Two has three related purposes: |
| | • Identify all non-immediate (i.e., non-emergency) cash-flow concerns: their sources and causes, magnitudes, timing, and effects on operations and quality of service. |
| | • Identify all root causes (including all actions and omissions of any entity) relating to both the immediate and non-immediate cash-flow concerns. |
| | • Evaluate all possible solutions to all cash-flow concerns and their causes. |

Phase One has three related purposes:

• Determine whether there is an emergency—which requires a definition of emergency (e.g., immediate threat to reliable electric service, risk of departure of key vendors). In this step, fault is irrelevant, but causation is relevant, to whether a cash-flow problem is an emergency.

• Determine whether the emergency, if one exists, can be addressed without immediate injection of more funds. That determine requires an analysis of immediate causes, such as one or more entities' actions or omissions.

• If immediate injection of more funds is necessary, determine if the source of funds should be an emergency rate, or instead entity funds (the latter because of an entity's fault).

En fin, resulta forzoso colegir que la información solicitada por National no es de naturaleza pública, pues la investigación de la cual forma parte el informe parcial aún no ha concluido.

**IV.**

Por los fundamentos antes expresados, se confirma la *Resolución* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones